[No. 6481–2–II.   Division Two.   November 19, 1984.]

JOHN Z. MILLER, ET AL, *Respondents*, v. THE CITY
OF PORT ANGELES, ET AL, *Appellants*.

*William R. Hickman* and *Craig D. Knutson,* for appellants.

*Clyde R. Cory, Jr.,* for respondents.

WORSWICK, A.C.J.—We are called upon to decide whether the City of Port Angeles has power to impose certain conditions on a real estate development. The challenged conditions involve the improvement of two roads, one of which is outside the city. We hold the conditions valid, but that one must be clarified.

John and Mary Miller own 13.4 acres in the southern outskirts of Port Angeles. The property was annexed to the City in 1973 after the Millers and the City had entered into a contract which imposed conditions on the development of an initial 24 lots. After annexation, the Millers developed those lots for single family residences. In 1978, they submitted a preliminary plat for the development of 144 multifamily units on the rest of the property. The City determined that an environmental impact statement was required. The EIS projected an additional 778 vehicle trips

per weekday on adjacent roads. This would result in a 22 percent increase in traffic on Golf Course Road which runs along the west side of the property and a 360 percent increase on Melody Lane to the south. The EIS predicted that accidents would increase on these already hazardous roads. As a consequence, the City attached conditions to its approval of the plat.[1] Condition 1.a required that the north side of Melody Lane be widened and that curbs, gutters and sidewalks be provided. Since Melody Lane was a

---

[1]There were eight conditions in all. The Millers did not object to the other seven, involving pedestrian walkways, storm drains, waste disposal, open space and landscaping.

Pertinent parts of the disputed conditions, 1.a and 1.b, provided:

a. Melody Lane shall be improved to a width of 28 feet with curb, gutter and sidewalk on the north side. Improvements shall include provisions for storm drainage and be subject to approval by the Port Angeles Public Works Department. (This condition is subject to approval by the Clallam County Commission or by acquisition of title to Melody Lane by the City through an annexation petition by residents of Melody Lane, whichever is first [sic].)

b. Golf Course Road from Melody Lane to the south boundary of Highway 101 shall be improved and upgraded, including street alignments at intersections of Third, Fourth and Fifth Streets, in accordance with specifications of the Department of Public Works. The developer of Uplands No. 4 Subdivision shall make monetary contributions toward the cost of providing the required improvements to Golf Course Road, by contributing to a special Golf Course Road Arterial Improvement Fund in accordance with the following procedures:

i. The total cost, in July, 1980, dollars, for the necessary improvements to Golf Course Road is estimated to be $340,036, which includes construction of the street, curbs, and sidewalk on one side in accordance with the City of Port Angeles, Washington State Department of Transportation, and American Public Works Association specifications and standards.

ii. The percentage of total cost to be borne by Uplands No. 4 development is $60,424.90. This figure is determined by dividing the 778 average trips (ADTs) generated by the development of Uplands No. 4, as described in the EIS, by the total average daily trips (ADTs) after construction of Uplands No. 4 (4,378 ADTs), as described in the EIS, and multiplying that percentage (18%) by the total cost necessary to construct Golf Course Road.

iii. The total cost to be borne by each dwelling unit in Uplands Division 4 is $416.66. This figure is determined by dividing the total share borne by Uplands No. 4 ($60,424.90) by the total number of dwelling units (144). Thus, for construction proposed in Uplands No. 4, Phase II (24 units), the total contribution is $9,999.84.

county road, this condition was to apply only if the road was annexed to the City or the County agreed to the improvements. Condition 1.b required the Millers to contribute about $60,400 to a Golf Course Road Arterial Improvement Fund, aimed at improving a portion of that road north of the development.

The Millers brought action in superior court seeking a writ of review, a declaratory judgment invalidating the conditions, and damages. The writ was issued by stipulation and a return was made in due course.

Beyond that, the record is a procedural quagmire. Two different judges participated over a 2–year period. Pleadings were amended, multiple motions were made and definitive rulings were announced; a year went by before one of these rulings found its way into an order. It will suffice for present purposes to note that, by summary judgment orders certified appealable under CR 54(b),[2] the "trial court" held that the disputed conditions were really special assessments and were unconstitutional because they were not imposed on all property abutting the road. It also found the conditions in violation of the 1973 agreement. It held that the Melody Lane condition was ultra vires. Damage claims based on allegations of negligence and wrongful requirement of an EIS were dismissed. The Millers were

---

[2]All orders were certified to be final and appealable under CR 54(b), which provides:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross claim, or third party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination in the judgment that there is no just reason for delay and upon an express direction for the entry of judgment.

A judgment of liability is not ordinarily appealable until damages have been awarded. *Bowing v. Board of Trustees of Green River Comm'ty College Dist. X,* 85 Wn.2d 300, 534 P.2d 1365 (1975). However, it is appropriate for us to consider all of the issues now, rather than hearing the case on a piecemeal basis. *See Schiffman v. Hanson Excavating Co.,* 82 Wn.2d 681, 513 P.2d 29 (1973). We agree with the trial court's certification that there is no just reason for delay of appellate review in this case. *See Doerflinger v. New York Life Ins. Co.,* 88 Wn.2d 878, 567 P.2d 230 (1977).

allowed to pursue their damage claims for breach of contract, subject to limits as to the period of time involved. Further proceedings were stayed pending this appeal by both parties.

A multitude of issues is raised concerning the validity of the conditions, the City's right to require improvements of a county road, the effect of the 1973 agreement, and the City's exposure to liability for damages. We hold that the conditions are valid, that the City has the qualified power to require improvement of a county road, that the 1973 agreement does not—and could not—affect the City's power, and that the City is not liable for damages. However, we hold that one condition must be clarified.

At the outset, we observe that the issues raised here were properly decided by summary judgment for there are no relevant material facts in dispute. *Wilson v. Steinbach,* 98 Wn.2d 434, 656 P.2d 1030 (1982). This is so notwithstanding the Millers' claim that the City acted in bad faith in requiring preparation of an EIS. They argued that the City's actions stemmed from a desire to discourage the development, or at least delay it until neighborhood opposition could be organized. They base this supposition on the friendly relations between a certain city councilman and an architect who had lost the bid on the subdivision. This argument, in addition to being purely speculative, is barred by the Millers' failure to contest within the statutory 30-day time limit the threshold determination that an EIS was required. RCW 43.21C.080; *Hayden v. Port Townsend,* 93 Wn.2d 870, 613 P.2d 1164 (1980); *Oden Inv. Co. v. Seattle,* 28 Wn. App. 161, 622 P.2d 882 (1981).

The Millers' basic position is that their development would not create any additional problems on the two roads and therefore no conditions whatever concerning roads should have been imposed. We disagree.

A decision to grant, deny or impose conditions upon a proposed plat is administrative or quasi judicial in nature. Review is limited to determining whether it satisfies constitutional requirements and is not arbitrary and capricious.

RCW 58.17.180;[3] *Lechelt v. Seattle,* 32 Wn. App. 831, 835, 650 P.2d 240 (1982). To succeed with their position, the Millers had to show that the City's actions were willful and unreasoning, or without consideration of or in disregard of the facts and circumstances of the case. *West Hill Citizens for Controlled Dev. Density v. King Cy. Coun.,* 29 Wn. App. 168, 627 P.2d 1002 (1981). They have not done so.

Under RCW 58.17.110,[4] before approving a subdivision a local government is required to make sure that appropriate provisions have been made for the public health, safety and general welfare. It *must* consider the adequacy of access to and within the proposed subdivision, and it is empowered to condition approval of the plat upon adequate access. *Lechelt v. Seattle, supra.* The information collected in the environmental review process indicated that the roads which would receive most of the traffic from the subdivision simply were not adequate to handle it. Melody Lane and Golf Course Road were already hazardous because they were narrow and had no shoulders, and because passing sight distances were restricted by the rolling terrain. The EIS predicted an increase in traffic accidents as a result of the vehicular trips generated by the project. In addition, the fire department pointed out that because the development was farther than the recommended distance from the nearest fire station, Golf Course Road would have to be widened to permit a reasonable

---

[3]RCW 58.17.180 provides in pertinent part:

"Any decision approving or disapproving any plat shall be reviewable for unlawful, arbitrary, capricious or corrupt action or nonaction by writ of review before the superior court of the county in which such matter is pending."

[4]RCW 58.17.110 provides, in relevant part:

"The city, town, or county legislative body shall inquire into the public use and interest proposed to be served by the establishment of the subdivision and dedication. It shall determine if appropriate provisions are made for, but not limited to, the public health, safety, and general welfare, for open spaces, drainage ways, streets, alleys, other public ways, water supplies, sanitary wastes, parks, playgrounds, sites for schools and schoolgrounds, and shall consider all other relevant facts and determine whether the public interest will be served by the subdivision and dedication."

response time. The increased traffic was also expected to increase police response time. Against this showing, the Millers presented the City Council with only the testimony of the coordinator for the EIS and of a Bellevue traffic engineer that the roads had the capacity to handle the increased traffic. However, it was also noted in the EIS that unstable flow, congestion and intolerable delay can occur well below capacity. A need for the improvements was clearly demonstrated, directly related to the traffic which would be generated by the development. The City acted reasonably to meet that need. The conditions were not arbitrary and capricious.

The Millers next contend that, because the burden of improving the roads was not imposed upon all adjacent property owners, the conditions were unconstitutional. This position is based on the argument that the conditions amounted to a tax or assessment for road improvements. We disagree.

■ Not all requirements for payment by a government body are taxes. Where the fees are intended primarily to regulate the development of a specific subdivision and not simply to raise revenue, they will not be considered taxes. *Hillis Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 650 P.2d 193 (1982). Widening streets and installing controls for the safety of pedestrians and vehicle traffic are regulatory measures within the proper exercise of the City's police power, and it can require that the cost of these measures be borne by those who created the need. *See State ex rel. Myhre v. Spokane*, 70 Wn.2d 207, 216, 422 P.2d 790 (1967); *Gerla v. Tacoma*, 12 Wn. App. 883, 533 P.2d 416 (1975).

The need for the improvements arose directly from the development. Moreover, the Millers were not required to pay more than their share of the cost. They were required to improve only the side of Melody Lane that abutted their property. Their contributions to the Golf Course Road Arterial Improvement Fund amounted to only 18 percent of the projected total, the remainder to be supplied from the municipal street fund, an LID composed of other abutting

owners, and matching federal funds. On these facts, we fail to see how the City acted unfairly in carrying out its responsibilities under RCW 58.17.110.[5]

The Millers also argue that the condition pertaining to Golf Course Road was unconstitutionally vague because the possibility of the improvements and the ultimate cost remained uncertain.[6] We are not persuaded.

Construction costs can rarely be known precisely in the planning stages and the fact that actual expenditures may vary, even substantially, from the estimates is not enough to invalidate the conditions. *See Pacific Cy. v. Sherwood Pac., Inc.,* 17 Wn. App. 790, 567 P.2d 642 (1977).

However, inasmuch as the Millers are being required to provide their share of the improvement costs before there is any guaranty the City will be able to raise the rest of the money, they are entitled to some assurance that if they do not get the improvements they are helping to finance, they will get their money back. We believe that is what the City intended, but condition 1.b does not clearly say so. Paragraph 6 provided:

---

[5]We would also point out that the conditioning of plat approval is analogous to the imposition of conditions on special use permits. In that context, the conditions are upheld if they (1) do not offend any provision of the zoning ordinance, (2) do not require illegal conduct on the part of the permittee, (3) are in the public interest, (4) are reasonably calculated to achieve some legitimate objective of the zoning ordinance, and (5) are not unnecessarily burdensome or onerous to the landowner. *Gerla v. Tacoma,* 12 Wn. App. at 889. Those requirements are satisfied here.

[6]Paragraphs 4 and 5 of condition 1.b provided:

"iv. For dwelling units developed pursuant to later approval, the cost per unit shall be determined by adjusting the cost figure in the calculation above. The cost figure increase shall be determined by use of the Engineering News Record Construction Cost Index, using July, 1980, as the base period, and $340,026 as the base cost. If the road has already been constructed, then the actual cost of construction shall be used to determine the per–unit cost.

"v. The remaining funds required for improving Golf Course Road will have to consist of Municipal Arterial Street Funds, moneys derived from an L.I.D., and other approved sources. These funds shall also be placed into the Golf Course Road Arterial Improvement Fund."

vi. If the moneys deposited by the developer into the Golf Course Road Arterial Improvement Fund are not expended at the end of seven (7) years from the effective date of Ordinance No. 2094 (August 18, 1980), they shall be returned to the developer, in accordance with Section 4 of Ordinance No. 2094.

The Millers argue that under this language, all or part of their money can be spent in obtaining financing, whether or not the improvements are undertaken. These administrative costs are not directly related to the problems generated by the development and cannot be charged to the Millers. Should the improvements not be accomplished, their money must be returned, and paragraph 6 should say so explicitly. This is an easily corrected error, however, and does not require invalidation of condition 1.b. Under circumstances such as these, an appellate court may return the case to the agency or governing body to permit it to correct the oversight. *Skold v. Johnson*, 29 Wn. App. 541, 553, 630 P.2d 456 (1981). *See also Barrie v. Kitsap Cy.*, 93 Wn.2d 843, 613 P.2d 1148 (1980); *Washington Pub. Employees Ass'n v. Community College Dist. 9*, 31 Wn. App. 203, 642 P.2d 1248 (1982).

The Millers next contend that even if such conditions could be imposed under proper circumstances, they cannot involve property outside the local government's jurisdiction. We disagree.

The City was required to consider effects of the development outside its territory *and mitigate them if possible. Save Our Rural Env't v. Snohomish Cy.*, 99 Wn.2d 363, 662 P.2d 816 (1983); *Cathcart–Maltby–Clearview Comm'ty Coun. v. Snohomish Cy.*, 96 Wn.2d 201, 634 P.2d 853 (1981); *Save A Valuable Env't v. Bothell*, 89 Wn.2d 862, 576 P.2d 401 (1978). Under the rule established by these cases, Port Angeles had only two alternatives. It had to find a way to mitigate the effects on the two roads, or it had to deny the Millers' application. It is more sensible to permit a municipality to deal positively with problems like these than to require it to avoid the problems by

denying the developments. Therefore, we hold that a city may properly require an improvement outside of its territorial jurisdiction if it conditions that requirement on annexation or the consent of the government having jurisdiction.

Finally, the Millers contend that the City was prevented by the 1973 agreement from imposing any additional conditions on their development. Our response is short. The City is required and empowered to make sure that subdivision developments are not inconsistent with the public health, safety and welfare and that they comply with the requirements of SEPA. RCW 58.17.110; *Loveless v. Yantis,* 82 Wn.2d 754, 765, 513 P.2d 1023 (1973). It cannot avoid this responsibility and it cannot contract away its police power. *Raymond Lumber Co. v. Raymond Light & Water Co.,* 92 Wash. 330, 159 P. 133 (1916); *Terrace Heights Sewer Dist. v. Young,* 3 Wn. App. 206, 473 P.2d 414 (1970). If and to the extent that the 1973 agreement can be read as prohibiting the City from imposing additional conditions no matter what sort of development the Millers produced, it was invalid and unenforceable.[7]

Because we hold the conditions valid, we need not discuss damages. However, we feel compelled to note that damages simply would not be recoverable in this case. The imposition of conditions on a subdivision involves discretionary governmental acts and is protected by discretionary immunity. *See Northwest Land & Inv., Inc. v. Bellingham,* 31 Wn. App. 742, 644 P.2d 740 (1982). The City's actions here fully satisfy the criteria for governmental immunity set forth in *Bender v. Seattle,* 99 Wn.2d 582, 664 P.2d 492 (1983).[8] Its land use policies were involved. It was acting

[7]That agreement is innocuous and can easily be read as contemplating nothing more than the immediate 24–lot development. We prefer, however, to rest our decision on broader grounds.

[8]The criteria suggested by *Bender* are: "(1) Does the challenged act . . . necessarily involve a basic governmental policy, program, or objective? (2) Is the . . . act . . . essential to the realization or accomplishment of that policy, . . . as

under explicit statutory authority, and it carefully balanced the risks and advantages of its actions.

The orders dismissing the Millers' claims are affirmed. The orders preserving any such claims for trial are reversed. Remanded with directions that the City clarify the conditions consistent with this opinion.

PETRIE, J., and HICKS, J. Pro Tem., concur.

Reconsideration denied December 19, 1984.

Review denied by Supreme Court March 1, 1985.

opposed to one which would not change the course or direction of the policy, . . .? (3) Does the act, . . . require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the . . . agency . . . possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, . . . or decision?" (5) Is there actual evidence that the agency consciously balanced the risks and advantages? *Bender v. Seattle,* 99 Wn.2d at 588-89.