[No. 11875–1–II.   Division Two.   August 21, 1990.]

SOUTHWICK, INC., *Appellant,* v. THE CITY OF LACEY, *Respondent.*

*Argal D. Oberquell,* for appellant.

*Kenneth R. Ahlf,* for respondent.

REED, J.—Southwick, Inc. (Southwick) appeals the imposition of conditions on a proposed development, contending that the City unlawfully delegated authority; that the conditions are unauthorized taxes or fees; and that the proceedings violated due process.[1] We affirm.

The City of Lacey follows a 2–step process in approving conditional uses of property: first allowing for issuance of the conditional use permit, and then performing a site–specific review of a detailed proposal for development. The Site Plan Review Committee reviews the specific development plans for compliance with city standards and policies. Lacey Municipal Code (LMC) 16.84.020.

Southwick sought and obtained a conditional use permit for expansion of its cemetery and funeral home complex. Southwick then applied for site plan approval. The Committee approved the site plan, but imposed several conditions. The conditions to which Southwick objects are the following:

> (1) Construction of street improvements, including street widening, paving, curb, gutter, sidewalk, and street lights; . . . (3) installation of a street light at the driveway access to a road; . . . (5) submission of plans, prepared by a registered professional engineer, for the street improvements and the water line extension to the Public Works Department; . . . (8) installation of fire sprinklers in the proposed structure; (9) provision of 1,500 to 2,250 gallons per minute of water to the structure; (10) installation of fire alarm system in the proposed structure with central station monitoring; . . .

---

[1]This case was argued October 3, 1989. The Supreme Court issued *R/L Assocs., Inc. v. Seattle,* 113 Wn.2d 402, 780 P.2d 838 (1989) on October 12, 1989. After a request from this court, the parties here submitted supplemental briefs on the application of *R/L Assocs.* to the present case.

On appeal, the hearing examiner upheld conditions 1, 3, 5, 8, 9, and 10. The Lacey City Council upheld the examiner's decision and the Thurston County Superior Court affirmed.

Southwick first argues that the delegation of authority to the site review committee was improper. As a code city under RCW 35A only the city council has the power to rezone. *Lutz v. Longview,* 83 Wn.2d 566, 570, 520 P.2d 1374 (1974). The council may not delegate that power. *Lutz,* 83 Wn.2d at 570. However, once the council approves the zoning change, site–specific review may be delegated to an administrative body. *Zehring v. Bellevue,* 103 Wn.2d 588, 591, 694 P.2d 638 (1985); *see also* RCW 35A.63.120. Design review to determine whether the development will meet particular criteria is not a rezone. *Zehring,* 103 Wn.2d at 591. Here the purpose of site review was to ensure that the proposed development met city standards, not to rezone. Therefore, the delegation was not improper.

Southwick also argues that the challenged conditions violate Const. art. 7, § 5,[2] which prohibits any tax not imposed pursuant to law, and RCW 82.02.020[3] which prohibits the imposition of taxes, fees, or charges on the construction or reconstruction of buildings, or on the development, subdivision, classification, or reclassification of land.

A city cannot tax without specific authorization by the Legislature. *San Telmo Assocs. v. Seattle,* 108 Wn.2d 20, 23, 735 P.2d 673 (1987). Clearly, no tax has been authorized covering this activity.

---

[2]Const. art. 7, § 5 provides as follows: "No tax shall be levied except in pursuance of law; and every law imposing a tax shall state distinctly the object of the same to which only it shall be applied."

[3]RCW 82.02.020 was amended in 1982 to include the following language: "No county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings, commercial buildings, industrial buildings, or on any other building or building space or appurtenance thereto, or on the development, subdivision, classification, or reclassification of land."

■ We must, therefore, determine if the exaction is a tax.

"[I]f the primary purpose of legislation is regulation rather than raising revenue, the legislation cannot be classified as a tax even if a burden or charge is imposed." The characterization of the development fees will, therefore, turn on a determination of the primary purpose of the fees. If the fees are merely tools in the regulation of land subdivision, they are not taxes. If, on the other hand the primary purpose of the fees is to raise money, the fees are not regulatory, but fiscal, and they are taxes.

(Citation omitted.) *Hillis Homes, Inc. v. Snohomish Cy.,* 97 Wn.2d 804, 809, 650 P.2d 193 (1982). *San Telmo,* after citing *Hillis Homes,* reaffirmed the test by saying "the municipal body cannot shift the social costs of development onto a developer under the guise of a regulation. Such cost shifting is a tax . . .". *San Telmo,* 108 Wn.2d at 24. Direct money payments to the city are not required for the exaction to be classified a tax—payment–in–kind may also be a tax. *San Telmo,* at 24.

The conditions imposed on the development here are not taxes. They are not equivalent to fixed charges that automatically apply to the activities proposed. Rather, they are directly tied to the property in question and are not aimed at general social ills. While fulfillment of the conditions will require the expenditure of money, cost alone does not make the requirements a tax.

Southwick's argument that the conditions violate RCW 82.02.020 is also unavailing. The Legislature passed RCW 82.02.020 in 1982, after *Hillis Homes.* In doing so, it sought to balance the interests of local governments and developers, both of which were having financial problems at the time of enactment. *Washington Legislative Reports* 207, 209 (1982).[4] The local schemes were often designed to

---

[4]Legislative documents created at the time the bill is being considered or passed do not control our decision, but may be instructive in determining legislative intent. *Seattle Times Co. v. Benton Cy.,* 99 Wn.2d 251, 255 n.1, 661 P.2d 964, 44 A.L.R.4th 322 (1983).

impose the cost of growth on new developments. *See Hillis Homes,* 97 Wn.2d at 806; *San Telmo,* 108 Wn.2d at 21–22.

While the early cases, such as San Telmo, interpreted the statute through a framework similar to that for distinguishing between a tax and nontax, such interpretation is untenable after the enactment of RCW 82.02.020 and *R/L Assocs. See R/L Assocs., Inc. v. Seattle,* 113 Wn.2d 402, 407–09, 780 P.2d 838 (1989). The general prohibition on direct or indirect taxes, fees, or charges operates unless the Legislature has excepted the exaction. *R/L Assocs.,* 113 Wn.2d at 409.

■■ Because we have determined that this exaction is not a tax, we need only determine if it is a fee or charge. A fee, like a tax, is a fixed charge, automatically applied to a designated activity. A charge is an obligation or a price.[5] Arguably, it could include the conditions imposed on various land use and development permits. However, we decline to construe the term so broadly. To do so, would be inconsistent with the broad authority granted to local government in land use matters. The basis for this authority is Const. art. 11, § 11, which provides: "Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." So long as the subject matter is local and the legislation is reasonable, this grant of authority is as broad as the Legislature's authority. *Hass v. Kirkland,* 78 Wn.2d 929, 932, 481 P.2d 9 (1971). The municipality's police power ceases when the State legislates on the subject, unless there is room for concurrent authority. *Diamond Parking, Inc. v. Seattle,* 78 Wn.2d 778, 781, 479 P.2d 47 (1971). A local ordinance conflicts with the general law when the ordinance permits that which the statute forbids, or forbids that which the statute allows. *Bellingham v. Schampera,* 57 Wn.2d 106, 111, 356 P.2d 292, 92 A.L.R.2d 192 (1960). The courts will not interpret a statute to deprive a municipality of the power to legislate

[5]Black's Law Dictionary (5th ed. 1979).

on particular subjects unless that clearly is the legislative intent. *State ex rel. Schillberg v. Everett Dist. Justice Court,* 92 Wn.2d 106, 108, 594 P.2d 448 (1979). RCW 35A-.01.010, the optional municipal code statute, under which Lacey operates, gives the municipality "the broadest powers of local self–government consistent with the Constitution of this state."

██ Other statutes specifically grant local governments the authority to adopt regulations designed to provide for ordered development and prevent overcrowding of land, to provide adequate streets and other amenities, to conserve natural beauty and other resources, RCW 35.63.100, RCW 58.17.110;[6] to impose restrictions on the use of land, and, *inter alia,* the type, height and bulk of buildings, RCW 35A.63.100,[7] and to condition any governmental action on the basis of appropriate environmental policies. RCW

---

[6]RCW 35.63.100 directs municipal governments to formulate regulations which are designed to encourage the most appropriate use of land throughout the municipality; to lessen traffic congestion and accidents; to secure safety from fire; to provide adequate light and air; to prevent overcrowding of land; to avoid undue concentration of population; to promote a coordinated development of the unbuilt areas; to encourage the formation of neighborhood or community units; to secure an appropriate allotment of land area in new developments for all the requirements of community life; to conserve and restore natural beauty and other natural resources; to encourage and protect access to direct sunlight for solar energy systems; and to facilitate the adequate provision of transportation, water, sewerage and other public uses and requirements, including protection of the quality and quantity of ground water used for public water supplies.

RCW 58.17.110 requires local governments to insure that proposed plats make appropriate provisions for the public health, safety, and general welfare and for such open spaces, drainage ways, streets, alleys, other public ways, water supplies, sanitary wastes, parks, playgrounds, sites for schools and school grounds and all other relevant facts, including sidewalks and other planning features that assure safe walking conditions for students who walk to and from school.

[7]RCW 35A.63.100 authorizes the municipal authority to enact ordinances which provide for "(2) Dividing the municipality, or portions thereof, into appropriate zones within which specific standards, requirements, and conditions may be provided for regulating the use of public and private land, buildings, and structures, and the location, height, bulk, number of stories, and size of buildings and structures, size of yards, courts, open spaces, density of population, ratio of land area to the area of buildings and structures, setbacks, area required for off–street parking, protection of access to direct sunlight for solar energy systems, and such

43.21C.060. For more than 20 years, these statutes have been interpreted by the courts to give local governments the authority to impose conditions upon development that are intended to mitigate the problems caused by the particular use. *See Save Our Rural Env't v. Snohomish Cy.,* 99 Wn.2d 363, 372, 662 P.2d 816 (1983); *State ex rel. Myhre v. Spokane,* 70 Wn.2d 207, 216, 422 P.2d 790 (1967); *Unlimited v. Kitsap Cy.,* 50 Wn. App. 723, 727, 750 P.2d 651, *review denied,* 111 Wn.2d 1008 (1988); *Miller v. Port Angeles,* 38 Wn. App. 904, 910–11, 691 P.2d 229 (1984), *review denied,* 103 Wn.2d 1024 (1985); and *Gerla v. Tacoma,* 12 Wn. App. 883, 888–89, 533 P.2d 416, *review denied,* 85 Wn.2d 1011 (1975).[8]

We do not believe that it was the Legislature's intent to preempt this authority by RCW 82.02.020. RCW 82.02.020 was not aimed at development–specific conditions such as those imposed here. Instead, the statute was aimed at the imposition of the general social costs of development on developers. The conditions imposed here do not contribute to that evil. Thus, we find that the imposition of the conditions here was not an exaction prohibited by RCW 82.02-.020.

We also note, however, that even if such site–specific conditions as these come under the purview of that statute, they constitute an exception to its prohibitions.

The statute "does not prohibit voluntary agreements with . . . cities . . . that allow a payment in lieu of a dedication of land or to mitigate a direct impact that has been identified as a consequence of a proposed development . . .". RCW 82.02.020. This language evinces legislative intent to stop the imposition of general social costs on developers, while at the same time allowing the continued imposition of costs that are directly attributable to the

---

other standards, requirements, regulations, and procedures as are appropriately related thereto."

[8]None of these cases was overruled by *R/L Assocs., Inc. v. Seattle, supra.*

development. There is no case law that interprets the meaning or scope of the term "voluntary agreements" in RCW 82.02.020. However, the discussion in the house of representatives of Senate Bill 4972, which amended RCW 82.02.020 with the language in question, is instructive.[9] Representative Eberle, who had "been working with" this provision, was asked for an explanation of "voluntary agreements." He replied:

> [T]hat question has been decided in court. Justice Marshall Neill of the Washington State Supreme Court and a former member of this body, states in *Chrobuck vs. Snohomish County (1971)* the following: '. . . The indicia of validity in such agreements include (1) The performance called for is directly related to public needs which may be expected to result from the proposed usage of the property to be rezoned. (2) Fulfillment of these needs is an appropriate function of the contracting governmental body. (3) Performance will mitigate the public burden in meeting those resulting needs by placing it more directly on the party whose property use will give rise to them. (4) The agreement involves no purported relinquishment by the governing body of its discretionary zoning power.
>
> "'Basically, a valid concomitant agreement operated to materialize [*sic*] any expected negative impact of the proposed property usage. In this, it is distinguished from an agreement which seeks to extract some collateral benefit from the property owner . . .'".[10]

---

[9]In construing a statute, the courts may consider the legislative debates during its pendency, and in particular, the response to a question by a legislator who has been involved in drafting the statute. *See Department of Labor & Indus. v. Metro Hauling, Inc.*, 48 Wn. App. 214, 218, 738 P.2d 1063 (1987); *State v. Leek*, 26 Wn. App. 651, 657, 614 P.2d 209 (1980).

[10]House Journal, 47th Legislature (1981), at 1417. Representative Eberle was referring to Justice Neill's dissent in *Chrobuck v. Snohomish Cy.*, 78 Wn.2d 858, 889, 480 P.2d 489 (1971).

In that opinion, Justice Neill observed that concomitant agreements provide a source of flexibility by allowing an intermediate use permit, between absolute denial and complete approval of the petition. He relied largely upon *State ex rel. Myhre v. Spokane*, 70 Wn.2d 207, 422 P.2d 790 (1967), in which the court approved a concomitant agreement which required the owners of reclassified property to pay $75,000 toward the construction costs of certain streets which would be needed because of the development of a shopping center in the rezoned area. The *Myhre* court held at 216:

> Widening streets and installing electrical controls for the safety of both pedestrians and vehicular traffic are regulatory measures which are within the

The municipality may force the payment of fees through these "voluntary/concomitant agreements" after showing that (1) the fee is to mitigate a direct impact, and (2) the fee is reasonably necessary as a direct result of the proposed development. *See* RCW 82.02.020; *see also* Comment, *Subdivision Exactions in Washington: The Controversy Over Imposing Fees on Developers,* 59 Wash. L. Rev. 289, 298 (1984).

▮ Rather than requiring a "voluntary" fee agreement, Lacey required Southwick to make the improvements, but this is of no import. It would be anomalous to allow the municipality to extract a fee with which to pay for improvements, but not to allow the municipality to extract the same economic value through requiring the developer to perform the required improvements as a condition of site approval.

▮ Under the statute and case law, it was incumbent upon the City to show that the improvements were required to mitigate the direct impact of the development. RCW 82.02.020. We review the decision under the arbitrary and capricious standard. *Pentagram Corp. v. Seattle,* 28 Wn. App. 219, 228, 622 P.2d 892 (1981). The City offered testimony and reports stating that the cemetery's growth potential required the improvements. Southwick did not refute this evidence. Thus, the Council's action was not arbitrary and capricious.

▮ Southwick's due process and estoppel arguments are unsupported by legal authority and will not be considered. *Puget Sound Plywood, Inc. v. Mester,* 86 Wn.2d 135, 142, 542 P.2d 756 (1975).

---

proper exercise of the city's police power. When the city requires that the cost of such safety measures be borne by the company, it is not bargaining away its regulatory police power but, rather, determining that the cost should be borne by the persons who created the necessity for the expenditure of such funds, instead of by the city generally. Such a determination is within the city's legislative authority.

896

The judgment is affirmed.

PETRICH, A.C.J., and WORSWICK, J., concur.