[No. 24680-1-I.    Division One.    November 4, 1991.]

LARRY COBB, ET AL, *Appellants*, v. SNOHOMISH COUNTY, *Respondent*.

452

*Richard B. Sanders* and *Sanders Law Office,* for appellants.

*Seth R. Dawson, Prosecuting Attorney,* and *Evelyn Sue Tanner, Deputy*; *Drew Nielsen* and *Nielsen, Nielsen & Leach,* for respondent.

PEKELIS, J. — Larry Cobb, Robert Hale, and R/L Associates, Inc. (Cobb), challenge the validity of Title 26B of the Snohomish County Code (SCC) which requires that developers share in the cost of improving road systems impacted by proposed land development projects. Cobb contends that the ordinance imposes unauthorized taxes, fees or charges on developers, violates substantive due process, and effects a taking of private property without just compensation.

I

A. SCC Title 26B.

On May 11, 1982, the Snohomish County Council adopted a revised road ordinance, SCC Title 26B, in an effort to address those problems associated with the increasing demand placed on county roads by intensified land use and rapid population growth. SCC 26B.50.010.

The declared purpose of the ordinance is to "ensure that public health, safety and welfare will be preserved by having adequate roads to new and existing developments by requiring all land development projects in unincorporated Snohomish county . . . to pay for a proportionate share of the cost of road improvements due to such land developments." Former SCC 26B.50.020.

To effectuate this purpose, the ordinance requires that developers agree to perform certain remedial measures before receiving land use approval from the County. Former SCC 26B.52.010. Developers are required, upon request, to prepare a comprehensive traffic study detailing the immediate and long-term effects of the proposed development on the level of traffic service (LOS) of the surrounding road system.[1] Former SCC 26B.53.030(f); *see also* former SCC 26B.52.010(1). The ordinance incorporates the LOS criteria outlined in the *Highway Capacity Manual*, a guide published by the Transportation Research Board of the National Research Council. Former SCC 26B.51.010. The criteria are based on the unused capacity of the particular lane in question, and may range from "A" (little or no traffic delays) to "E" (very long traffic delays).

Under chapter 26B.55, developers may have to agree to contribute to certain road improvements in order to obtain project approval. In general, the greater the expected traffic delay following a project's completion, the greater the obli-

---

[1] Former SCC 26B.51.080 defines a "road system" as: "[T]hose existing or proposed county roads (if any) which are located in the development site and/or between the development site and the nearest state highway or highways, projected to be utilized by ten percent or more of the traffic generated by the development."

gation imposed upon the developer. Thus, where a project will be served by a road system of LOS A or B, the developer has no obligation to make off-site road improvements. At most, the developer may be required to perform frontage road improvements or dedicate an additional right of way. Former SCC 26B.55.020.

Where a project will be served by a road system of LOS C, the developer is obligated to agree not to protest formation of a road improvement district (RID) and also may be required to perform frontage road improvements or dedicate an additional right of way. Former SCC 26B.55.030.

In contrast, "developers whose projects will be served by a road system which will be at level of service D following completion of the development shall incur obligations to mitigate the direct impact of said development." This is to be done by executing a valid written voluntary agreement with the county in which the developer agrees to pay a proportionate share of the cost of mitigation improvements. Former SCC 26B.55.040(1). The proposed development will not be approved until all necessary funding is committed and the project is under contract or construction. Former SCC 26B.55.040(2).

B. Cobb's Subdivision.

In December 1987, Cobb applied to the County for preliminary plat approval to subdivide a 5.07-acre parcel of property into 18 single family lots. The proposed subdivision, named "Zenith Village", was located north of 234th Street S.W. and west of State Highway 99 (SR 99). Cobb was a contract purchaser of part of the property and an agent for the owners of the remaining portions. Pursuant to SCC 26B.53, Cobb furnished the County Department of Public Works (DPW) with a traffic study detailing, *inter alia*, the impacts of the subdivision on the 234th Street S.W./SR 99 intersection. The study concluded that:

> [t]he intersection of 234th St. S.W. and Highway 99 would operate at the C/D range as indicated by the attached analysis. Traffic movements with proposed subdivision traffic all operate at LOS C. It is only those movements approaching Highway 99 from the east and Highway 99 southbound left

turn movements that would operate at LOS D. The proposed subdivision would not contribute any vehicles to these movements.

Although the DPW found Cobb's study generally acceptable, it took the position that the question of whether the development directly impacted traffic conditions was determined by characterization of the *entire* 234th Street S.W./ SR 99 intersection. Since this intersection as a whole would operate at LOS D, Cobb was asked to submit a mitigation proposal pursuant to former SCC 26B.55.040(1)(a). Cobb and the DPW entered into negotiations to determine the appropriate fee to mitigate the direct impact of the development on the intersection in question but were unable to reach an agreement on the correct formula to be applied. Thus, under former SCC 26B.55.070(2), the matter was brought before a hearing examiner to decide on the correct impact mitigation measures to be undertaken as a condition of plat approval.

At the hearing the DPW claimed that because Cobb's development would result in adding vehicles to an intersection which was already at LOS D, his proportionate share should be based upon full improvement of the entire intersection. It thus asked the hearing examiner to reject Cobb's mitigation offer, which was based simply on a proportionate share of the estimated $10,000 cost of a left turn lane for the west leg of 234th/SR 99 intersection, the only leg his development would directly affect.

The hearing examiner found Cobb's traffic impact mitigation offer unacceptable, determining that, as the DPW contended, only full improvement of the entire intersection from LOS D to LOS B or better satisfied the mitigation requirement. Additionally, the hearing examiner noted that because the State Department of Transportation had no plans for major signalization or road improvements, Cobb's offer for the 234th Street SW/SR 99 intersection was infeasible.

On appeal, the Snohomish County Council upheld the hearing examiner's decision. Cobb then brought an action in

Snohomish County Superior Court, requesting that SCC Title 26B be declared invalid as an unconstitutional tax. The trial court denied Cobb's motion for declaratory relief on the grounds that its "interpretation of SCC 26B that the maximum exaction required from an applicant cannot exceed the pro rata cost of roadway improvements attributable to an applicant's proposed project" rendered the ordinance constitutional.

The trial court ordered the County to grant Cobb's application for preliminary plat approval upon payment of his pro rata share of the proposed left turn lane. In essence, the trial court adopted Cobb's mitigation offer which the hearing examiner had rejected. The court gave Cobb the choice of paying a flat $25 fee or an exaction based on a revised calculation of Cobb's proportional share. He paid the $25 fee under protest.

Cobb appeals, challenging both the validity of SCC Title 26B on its face and as applied to his request for preliminary plat approval of his proposed subdivision.

## II

Cobb contends first that SCC Title 26B is nothing more than a scheme for imposing taxes, fees, or charges on developers in violation of RCW 82.02.020.

RCW 82.02.020 provides in relevant part:

[N]o county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings, commercial buildings, industrial buildings, or on any other building or building space or appurtenance thereto, or on the development, subdivision, classification, or reclassification of land.

Laws of 1982, 1st Ex. Sess., ch. 49, § 5 (effective July 1, 1982).

■ Early cases interpreting this statute focused on "whether a development fee constituted an unauthorized tax or a valid regulatory scheme, as that distinction was explained in *Hillis Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 809, 650 P.2d 193 (1982)". *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 408, 780 P.2d 838 (1989). However, as *R/L*

*Associates* makes clear, the "tax/regulation distinction" is no longer relevant because the statutory prohibition against "taxes, fees, or charges" is so all-encompassing it applies to all development fees unless specifically excepted. *R/L Assocs.*, 113 Wn.2d at 409.

Accordingly, if SCC Title 26B required developers to pay a fee, tax, or charge even if that were specifically used for payment of off-site road improvements, it would run afoul of RCW 82.02.020. However, RCW 82.02.020 also creates an exception for "voluntary agreements . . . that allow a payment in lieu of a dedication of land *or* to mitigate a direct impact that has been identified as a consequence of a proposed development, subdivision, or plat." (Italics ours.) In other words, a developer may enter into an agreement with local government to pay a fee which local government has established is "reasonably necessary as a direct result of the proposed development or plat." RCW 82.02.020; *see also Southwick, Inc. v. Lacey,* 58 Wn. App. 886, 895, 795 P.2d 712 (1990); Comment, *Subdivision Exactions in Washington: The Controversy Over Imposing Fees on Developers,* 59 Wash. L. Rev. 289, 298 (1983-1984).

It is apparent that Snohomish County has attempted in SCC Title 26B to comply with the "voluntary agreement" exception in RCW 82.02.020. On their face, the negotiated agreement provisions in former SCC 26B.55.040 mirror the requirements for the voluntary agreement exception within the statute. The provisions provide a scheme which allows the developer to agree to pay for its share of reasonably necessary improvements to roads directly impacted by the proposed development. *See, e.g.,* former SCC 26B.55-.040(1)(c), (d); *see also* former SCC 26B.55.080.

■ Cobb asserts that the agreements provided for in former SCC 26B.55.040 are not "voluntary" within the meaning of RCW 82.02.020 because approval of the proposed development is conditioned upon the agreement's execution. We disagree. Within the context of RCW 82.02.020, the word "voluntary" means precisely that the developer has the choice of either (1) paying for those reasonably

necessary costs which are directly attributable to the developer's project or (2) losing preliminary plat approval. The fact that the developer's choices may not be between perfect options does not render the agreement "involuntary" under the statute. Comment, 59 Wash. L. Rev. at 298; *see generally* R. Settle, *Washington Land Use and Environmental Law and Practice* 114-15 (1983).[2]

Moreover, Cobb does not claim that he has an absolute right to receive plat approval; he clearly does not. The county is authorized to withhold approval if appropriate provisions have not been made for the public health, safety, and general welfare. RCW 58.17.110; *see also Southwick, Inc. v. Lacey,* 58 Wn. App. 886, 892-93, 795 P.2d 712 (1990); *Miller v. Port Angeles,* 38 Wn. App. 904, 909, 691 P.2d 229 (1984), *review denied,* 103 Wn.2d 1024 (1985). In adopting SCC Title 26B, Snohomish County had declared that new developments have the potential of impacting traffic in such a way as to create serious health, safety and welfare problems. The purpose of former SCC 26B.55.040 is to make appropriate provisions for mitigating the direct impact of new developments on existing roads.

Accordingly, we conclude that the voluntary agreement scheme contemplated by SCC Title 26B is not violative of RCW 82.02.020. The ordinance properly permits voluntary agreements between developers and the county for payment of a fee to mitigate the direct impact of the traffic problems of the county. In so deciding, however, we do not reject Cobb's challenge to the specific provisions of the ordinance as applied to his proposed subdivision. Cobb correctly contends that the traffic his development would contribute,

---

[2] We disagree with Cobb's assertion that *Ivy Club Investors Ltd. Partnership v. Kennewick,* 40 Wn. App. 524, 699 P.2d 782, *review denied,* 104 Wn.2d 1006 (1985) holds that a fee is not voluntary if the proposed development is conditioned upon its payment. Although the court characterized the park fees in that case as involuntary, it did so within the context of the *Hillis Homes, Inc. v. Snohomish Cy.,* 97 Wn.2d 804, 650 P.2d 193 (1982) tax/fee test, rejected in *R/L Associates. Ivy Club,* 40 Wn. App. at 529. There is no indication that the court's characterization was based on an analysis of the voluntary agreement exception in RCW 82.02.020.

when properly calculated *under the ordinance itself*, does not justify application of the LOS D provisions.

■ Under the statute, it was incumbent upon the County to show that the required improvements were "reasonably necessary" to mitigate the direct impact of the development. *Southwick, Inc.*, 58 Wn. App. at 895. This decision is reviewed under the arbitrary and capricious standard. *Southwick, Inc.*, 58 Wn. App. at 895 (citing *Pentagram Corp. v. Seattle*, 28 Wn. App. 219, 228, 622 P.2d 892 (1981)).

Here, SCC Title 26B expressly incorporates the *Highway Capacity Manual*'s definitions relating to traffic design, traffic flow and traffic operation. According to the manual, the LOS within an intersection relates to the unused capacity of the traffic *lane* in question within the intersection, not the entire intersection itself.

■ While Cobb's development contributed some traffic to LOS C traffic lanes, it contributed none whatsoever to the LOS D traffic lanes. The trial court apparently recognized this and thus attempted to correct the hearing examiner's error by limiting Cobb's obligation to the proportionate cost of the left turn lane of the intersection. However, the trial court's ruling is also improper. Because the lane impacted by Cobb's development would be at LOS C, not D, under SCC 26B.55.030, the court had no authority to require mitigation at all. The only obligation which the County could impose on Cobb was that he agree not to protest the formation of an RID.

Accordingly, we hold that while the mitigation scheme provided for in SCC Title 26B does not on its face violate RCW 82.02.020, both the hearing examiner's and the trial court's application of SCC Title 26B to Cobb's plat was arbitrary and capricious. Therefore, Cobb's $25 payment is to be refunded and the plat approval granted in conformance with the requirements of former SCC 26B.55.030, not .040.[3]

---

[3]Cobb also claims that SCC Title 26B unconstitutionally deprives him of substantive due process and effects a taking without just compensation. We have rejected Cobb's claims insofar as they are based on the assertion that SCC Title 26B is invalid on its face as a tax, fee, or charge. To the extent Cobb also asserts

## III

■ Cobb has requested attorney fees on a number of grounds. Attorney fees may not be awarded in the absence of statutory authority or an applicable equitable or contract provision. *Blue Sky Advocates v. State*, 107 Wn.2d 112, 122, 727 P.2d 644 (1986). We conclude that the only possible ground on which he would be entitled to attorney fees here would be under RCW 64.40.020, which provides in part:

> (1) Owners of a property interest who have filed an application for a permit have an action for *damages* to obtain relief from acts of an agency which are arbitrary, capricious, unlawful, or exceed lawful authority, or relief from a failure to act within time limits established by law: *Provided*, That the action is unlawful or in excess of lawful authority only if the final decision of the agency was made with knowledge of its unlawfulness or that it was in excess of lawful authority, or it should reasonably have been known to have been unlawful or in excess of lawful authority.
>
> (2) The prevailing party in an action brought pursuant to this chapter may be entitled to reasonable costs and attorney's fees.

(Italics ours.)

However, because Cobb has reserved the damages issue under this statute, his request for attorney fees is premature. On remand if Cobb prevails in his action for damages and the trial court awards attorney fees and costs, Cobb should also receive an award of fees and costs incurred in this appeal in such sum as the trial court shall determine reasonable.

Accordingly, we reverse and remand for further proceedings consistent with an interpretation of Cobb's obligations under former SCC 26B.55.030 and his claim for damages.

---

that former SCC 26B.55.040(2) can result in the developer having to pay more than the developer's pro rata cost if the county is unwilling to contribute funding, we decline to address this claim. Because our holding takes Cobb's development outside the LOS D category, we need not and do not decide whether the LOS D requirements under former SCC 26B.55.040 are constitutional.

GROSSE, C.J. (concurring) — I concur in the result reached in the lead opinion, but write separately to state my view that it is unnecessary in this case to decide the issue of the validity of the ordinance.

AGID, J. (concurring in part, dissenting in part) — While I concur in the result reached in the lead opinion with respect to the erroneous interpretation of Title 26B of the Snohomish County Code (SCC), I disagree with its conclusion that agreements under former SCC 26B.55.040 are "voluntary" agreements under RCW 82.02.020. I therefore write separately to address this issue.

RCW 82.02.020 was enacted by the Legislature in 1982

> as part of comprehensive legislation that included the grant of authority to certain local governments to impose additional sales and real estate transfer taxes. Along with this additional taxing authority, the Legislature imposed a prohibition of certain development fees. This amendment was the first to confront the imposition of fees as a condition to development, even though there had been other proposals before the Legislature to expand or limit municipalities' authority to impose such fees.

(Citations omitted.) *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 406-07, 780 P.2d 838 (1989).

In *R/L Associates*, the Supreme Court recognized that earlier cases had "resisted a literal application of RCW 82-.02.020". 113 Wn.2d at 408. In determining that henceforth the statute must be strictly applied, the court observed that

> the [earlier] cases implicitly recognized the importance of the statute as a source of local government's authority to economically burden development, but gave the statute a narrow construction and limited application. However, in the light of the Legislature's clear intent as embodied in the statute's language, and the circumstances surrounding its enactment, we find that such a construction is not warranted, and will apply the statute according to its plain and unambiguous terms.

*R/L Assocs.*, 113 Wn.2d at 409. Thus, our first task is to determine, in the context of this case, what those "plain and unambiguous terms" are.

In order to properly analyze RCW 82.02.020, we must first clarify what it is and is not. It is apparent that it is not an enabling statute. It confers no authority on municipalities to impose conditions on development or charge fees in the absence of independent authority permitting the imposition of conditions for which the fee is a substitute. The statute is first and foremost a taxing statute. It begins by declaring that

> Except only as expressly provided in [three statutes not relevant here], the state preempts the field of imposing taxes upon [various commodities and activities]. . . . Except as provided in RCW 82.02.050 through 82.02.090, no county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings, commercial buildings, industrial buildings, or on any other building or building space or appurtenance thereto, or on the development, subdivision, classification, or reclassification of land. However, this section does not preclude dedications of land or easements within the proposed development or plat which the county, city, town, or other municipal corporation can demonstrate are reasonably necessary as a direct result of the proposed development or plat to which the dedication of land or easement is to apply.

RCW 82.02.020. As a first principle, then, the statute is a prohibition on direct or indirect taxes, fees, or charges on development activity except that on-site dedications and easements which are permitted by other statutes are not prohibited by RCW 82.02.020.

While generally prohibiting what have come to be known as development fees or exactions, RCW 82.02.020 then enumerates certain exceptions which include "*voluntary* agreements . . . that *allow* a payment in lieu of a dedication of land or to mitigate a direct impact that has been identified as a consequence of a proposed development, subdivision, or plat." (Italics mine.) The voluntary agreement provisions of RCW 82.02.020 do not themselves grant authority to require developer exactions. Rather, they "allow" the local government and the developer to enter into an agreement to pay a fee as an alternative to dedicating land or complying with a mitigation requirement which that government may impose

as a result of authority granted by another statute or ordinance.[4]

The County cites us to no independent authority which would permit it to require Cobb to construct or contribute to the construction of a left turn lane at the intersection of State Highway (SR) 99 and 234th Street S.W.[5] Thus, the first problem with former SCC 26B.55.040 is that it exceeds the limited authority of RCW 82.02.020 by imposing "voluntary" fees as a condition of project approval where the county has no independent authority to impose a condition for off-site improvements. The ordinance simply pronounces that, where the project is found to impact roads which are at LOS D or E, the developer shall form a road improvement district (RID) to fund "full improvements"[6] or enter into a "voluntary agreement" to pay for some or all of the

---

[4]For example, RCW 58.17.110(2) permits the local government to require "[d]edication of land to any public body . . . as a condition of subdivision approval". Similarly, under the authority of the State Environmental Policy Act of 1971, applicants may, under circumstances dictated by the statute, be required to comply with conditions imposed by local government to "mitigate specific adverse environmental impacts" of a proposal. RCW 43.21C.060. These conditions may include reconfiguration of lots, preservation of open space, improvement of utilities and numerous other conditions for which an applicant may prefer to pay a fee for off-site mitigation measures rather than significantly change the configuration of the development.

[5]We note that this project was not found to require an environmental impact statement under SEPA, and no significant adverse environmental impacts associated with the roads in question were identified which would permit the County to require mitigation under RCW 43.21C. Nor could fees be imposed in this case under RCW 82.02.050 et seq., which do permit local governments to require developers to pay impact fees to finance their proportional share of "new facilities needed to serve new growth and development", RCW 82.02.050(1)(b), because that statute was not enacted until 1990.

[6]Of the four options under former SCC 26B.55.040(1), only one does not involve an agreement to pay a fee. Subsection (b) allows formation of an RID for "full [rather than a proportionate share] improvements" to the road or roads in question. However, an RID was clearly impossible here because SR 99 is a state road which the Department of Transportation did not want improved, and the cost of funding the entire left turn lane greatly exceeded the fee. It is also not at all clear that formation of an RID under these circumstances was feasible since Cobb's project represented such a small proportion of the properties that would have to consent to the RID.

improvements. In the absence of independent authority to require the developer to build the improvements, the county cannot use RCW 82.02.020 as part of a bootstrap operation to supply that authority and then require payment of a fee as a substitute for construction of improvements it cannot require in the first place.

The second major problem with the ordinance arises from its apparent misapprehension of the meaning of the word "voluntary" as it is used in RCW 82.02.020. As noted above, the statute

> does not prohibit voluntary agreements with counties, cities, towns, or other municipal corporations that allow a payment in lieu of a dedication of land or to mitigate a direct impact that has been identified as a consequence of a proposed development, subdivision, or plat.

The word "voluntary" is not defined in the statute. Where there is no statutory definition, the court must give a word its ordinary and usual meaning. *State v. Standifer*, 110 Wn.2d 90, 92-93, 750 P.2d 258 (1988). The word "voluntary" is defined as "proceeding from the will[;] produced in or by an act of choice . . . [;] . . . performed, made, or given of one's own free will . . . [;] . . . acting of oneself[;] not constrained, impelled, or influenced by another". *Webster's Third New International Dictionary* 2564 (1986).

In order to be voluntary, an agreement must at least present the parties with a viable choice. However, under the Snohomish County ordinance at issue here, former SCC 26B.55.040, the only option given the permit applicant is to pay a fee or have the requested permit application denied. This is not a choice. It is tantamount to a contract of adhesion where, if the applicant wants the permit, there is no choice but to accept the terms that are dictated by local government officials. The permit applicant is not acting of his or her own will "not constrained [or compelled] by another" when paying a fee solely to avoid denial of the requested land-use approval.

This is not to say that, in the context of obtaining development permits, the statutory provision allowing voluntary developer agreements is meaningless. On the contrary, there are numerous instances in which an applicant, legitimately required under another statute to dedicate land, reduce the size of a proposed development, or take other steps to mitigate impacts, will voluntarily choose to pay a fee instead. Should the applicant determine that a dedication of land would detract from the appearance of or reduce the market for its project, it may choose to pay a fee rather than dedicate the land which the local government can legitimately require pursuant to RCW 58.17. In order to mitigate impacts on an environmentally sensitive area, a developer may choose to contribute funds to additional drainage facilities or improvement of an off-site stream or wetland. Both the municipality and project applicants may agree that it is mutually beneficial for the developers to pay into a fund to purchase a large amount of open space to be developed into a park rather than accepting dedications of small areas of open space which are not amenable to such desirable improvements as ball fields, playgrounds and the like. While perhaps not entirely desirable from the applicant's viewpoint, these are true choices because the local government has clear authority to require the applicant to dedicate the land or mitigate the impact.

Former SCC 26B.55.010(4) and .040 purport to allow the County, as they did in this case, to decide that the only feasible method "of accomplishing the required road work" is payment of a fee. Under such circumstances, the other "choice" provided by the ordinance, formation of an RID to fund the full cost of the improvement, becomes illusory, and the developer is left to pay the fee or face denial of its proposal. Such agreements are not "voluntary" within the meaning of RCW 82.02.020 and exceed the authority granted to the county to impose fees. Former SCC 26B.55-.040 is therefore invalid on this ground as well.

I recognize that another division of this court has defined "voluntary" in the context of RCW 82.02.020 in a manner that would arguably permit Snohomish County to impose fees under the statute. *Southwick, Inc. v. Lacey*, 58 Wn. App. 886, 795 P.2d 712 (1990). However, a review of the conditions to which Southwick was objecting in that case clearly distinguishes it from this one. In that case, the developer was objecting to requirements that it make improvements to the streets and sidewalks both on site and immediately adjacent to its expanded cemetery and funeral home complex, provide plans for and install improvements in water service to its project, increase the flow of water to the property and install sprinklers and a fire alarm system on the premises. All of these are improvements to the property itself or are required to facilitate services to the project which the City of Lacey could impose pursuant to the zoning, building and fire codes already in effect.[7] The City neither relied upon RCW 82.02.020 for authority to impose these requirements nor authorized payment of a fee in lieu of building the required improvements. This alone distinguishes *Southwick* from this case because, as noted above, Snohomish County had no authority independent of RCW 82.02.020 to require Cobb to improve the intersection in question.

In addition, I question the interpretation the *Southwick* court gave to the word "voluntary" in the statute. It relied upon the dissent in *Chrobuck v. Snohomish Cy.*, 78 Wn.2d 858, 889, 480 P.2d 489 (1971), in which the issue was entirely different.[8] At issue there was the assertion that the

---

[7]For example, the Uniform Building, Mechanical and Fire Codes, together with applicable code standards, which must be adopted by every municipality in Washington, RCW 19.27.031, provide independent authority to require adequate sprinkler, fire alarm and water systems. Cities of all classes are granted legislative authority to adopt ordinances to provide standards for construction and maintenance of streets, sidewalks, gutters and associated improvements on site. RCW 35.22.280 (first class cities); RCW 35.23.440 (second class cities); RCW 35.70 (third class cities); RCW 35.27.370 (towns); RCW 35A.11.020 (optional municipal code cities).

[8]The majority in *Chrobuck* did not reach the issue of the validity of the concomitant zoning agreement on which the *Southwick* opinion is based because

County could not enter into a concomitant zoning agreement with a property owner because to do so would bind the County to exercise its zoning power in a particular way, thus impermissibly "bargaining away its regulatory police power". *Chrobuck*, 78 Wn.2d at 888 (Neill, J., dissenting) (quoting *State ex rel. Myhre v. Spokane*, 70 Wn.2d 207, 216, 422 P.2d 790 (1967)).[9]

The issue in *Chrobuck* and *Myhre* was whether the *local government* could enter into an agreement to grant a rezone without committing an ultra vires act. That is far from the issue here; *i.e.*, whether an agreement to pay a fee to offset the cost of an off-site improvement is voluntary when the county lacks independent authority to require construction of the improvement in question. Thus, while I have no quarrel with the indices of validity of a concomitant zoning agreement set out in *Chrobuck*, reliance on those factors is not relevant to or persuasive in determining whether an agreement is voluntary under RCW 82.02.020.

Finally, former SCC 26B.55.040 does not comply with the requirement of RCW 82.02.020 that fees, where permissible, "mitigate a direct impact that has been identified as a consequence of a proposed development". This statutory phrase reflects the Legislature's adoption of the "nexus" requirement imposed by case law on governmental exactions and conditions. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987). Simply stated, there must be a nexus, a direct connection, "between the condition and the original purpose of the building restriction". *Nollan*, 483 U.S. at 837. Where the exaction or other condition does not mitigate an impact of the development, it

---

it reversed the rezone on other grounds. This issue was addressed only in Justice Neill's dissent. *Chrobuck*, 78 Wn.2d at 874, 887.

[9]A concomitant zoning agreement is a contract between the governing body of the municipality and the applicant for a rezone which conditions approval of the rezone on the agreement of the applicant to comply with conditions on its use and development of the property. *Myhre*, 70 Wn.2d at 209. The conditions agreed to must be permissible exercises of the police power authorized by statute or ordinance. *Myhre*, at 215-17; *Besselman v. Moses Lk.*, 46 Wn.2d 279, 280 P.2d 689 (1955).

is an unlawful exercise of the police power. *Unlimited v. Kitsap Cy.*, 50 Wn. App. 723, 727, 750 P.2d 651, *review denied*, 111 Wn.2d 1008 (1988), *cited with approval in Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 336 n.30, 787 P.2d 907, *cert. denied*, 111 S. Ct. 284 (1990).

The Snohomish County ordinance applies to "[d]evelopers whose projects will be served by a road system which will be at level of service [LOS] D following completion of the development". Where the road system itself is at LOS D, the developer is then required to "mitigate the direct impact of said development". Former SCC 26B.55.040(1). This language allows Snohomish County to impose the requirements of the ordinance whether or not the direct impact of the development causes the road system in question to be at LOS D. Exactions on this basis are not permitted by the terms of RCW 82.02.020. The statute requires that any exactions be imposed in order to mitigate an impact of the development. If the road system is LOS D with or without the project, there is no impact to be mitigated, and the nexus requirement of the statute is not satisfied.

The problem is illustrated by the facts of this case. Cobb's proposal is for 18 lots which will add nine peak-hour trips to an intersection in which the existing peak-hour trips total 2,622. Its maximum impact will be to add two left-turning vehicles to a left turn lane which is now and will continue to be at LOS C. Where, as here, there is no showing that the project will contribute to a worsening of the level of service, RCW 82.02.020 does not permit imposition of fees to offset the costs of mitigation measures. There simply is no significant impact to mitigate.

In summary, in the absence of another statute or ordinance permitting the county to require mitigation of the impacts of the project, a nexus between those impacts and the mitigation measures being imposed, and a true choice offered to the project proponent to pay a fee rather than construct improvements or dedicate land to satisfy the legitimate requirement that it mitigate the direct impacts of

development, the county is without authority to require a developer to pay a fee.

To rule otherwise is to effectively write the word "voluntary" out of RCW 82.02.020. The Supreme Court has unequivocally held that the statute must be interpreted "according to its plain and unambiguous terms", *R/L Assocs.*, 113 Wn.2d at 409. This approach to the statute gives the word "voluntary" its ordinary meaning and furthers the intent of the Legislature that local government's power to exact fees from developers be limited to those circumstances in which the Legislature has affirmatively granted authority to do so.

After modification, further reconsideration denied February 28, 1992.

Review denied at 119 Wn.2d 1012 (1992).