[No. 32243-5-I.   Division One.   August 22, 1994.]

CASTLE HOMES AND DEVELOPMENT, INC., *Appellant*, v. THE CITY OF BRIER, ET AL, *Respondents*.

*Timothy Laurence McMahan*, for appellant.
*Thomas Charles Evans*, for respondents.

GROSSE, J. — This case is an appeal from the trial court's determination that the decision of a special hearing examiner, as adopted by the Brier City Council (City Council) in resolution 370, was not arbitrary, capricious, or unlawful, except as modified by the trial court.[1] The City of Brier (City) cross-appeals part of the decision wherein the court held that both parties were prevailing parties, thus precluding an award of attorney fees and costs.

## FACTS OF THE CASE

This case came about because of a proposed plat by Castle Homes and Development, Inc. (Castle Homes), designated as Castle Crest II. It is a 28-lot development on 10.3 acres. The development is in the northwest quadrant of the city, and borders the city of Mountlake Terrace. In 1989, Castle Homes filed a preliminary plat with the City. At the time there were additional subdivisions approved or at various stages of approval in the northwest quadrant of the city which were before the City Council. Because of this rapid growth, the City retained engineers and transportation planner Donald Carr to advise it regarding traffic-related growth impacts. In the meantime, the City issued a determination of nonsignificance (DNS) for Castle Crest II on February 7, 1990.

Carr's traffic studies indicated there would be a substantial increase in traffic due to the cumulative effect of all these proposed subdivisions. The report also concluded that the roads in the city were substandard and would result in unsafe driving conditions.

Due in part to this study, the City withdrew its previous DNS for Castle Crest II on May 8, 1990. It issued a notice of probable environmental significance. On May 11, 1990, Castle Homes appealed the determination of significance. A hearing was scheduled for late June 1990.

---

[1]The trial court determined that part of resolution 370 should be remanded for further consideration and review of a "street light issue", and that "Section 2" of resolution 370, authorizing the City to withhold payment of $9,369.50 for reimbursement of offsite improvements, was unlawful and remanded the matter for immediate refund of the amount. That issue is not before this court.

Carr issued a second traffic study regarding "Cumulative Traffic and Mitigation". This study used some of the documents produced by Castle Crest's expert, Terry Gibson, and Gibson Traffic Consultants. Carr's original estimate for a "Cadillac" street system in the northwest quadrant was approximately $10,000 per lot on a proportional share basis.[2]

Due to this high estimate, the City's superintendent of public works requested that Carr revise the plan to a "bare bones" plan to ensure safe roadways. The second traffic report contained an estimate which calculated both "proportional share" and "fair share" impact mitigation fees that would offset the cumulative impact of development in the area. The "proportional share" was calculated at approximately $6,500 per lot; the "fair share" was calculated at approximately $962 per lot.[3] These figures came from a letter and cumulative traffic report dated June 22, 1990, from the traffic engineering firm of David Evans and Associates, Inc., engaged by the City to its superintendent of public works. In the report the total estimated costs were broken down into proportional and fair shares. A revised version of this report dated June 26, 1990 was set forth later. This third report removed any "fair share" calculation.[4]

---

[2]"Proportional share" is a term used by the parties to describe the full cost of the identified street projects divided by the total number of lots in all the new subdivisions. "Fair share" describes the cost to a developer for the traffic impacts directly related to the individual project. "Fair share" is figured as the total separate project cost less a share amount subtracted for the existing use of the street system and also for a share due to the "sins of neglect" of the street system as it existed.

[3]Throughout much of the hearing process the number of lots in the Castle Crest II development was mistakenly believed to be 26, when in actuality it is 28. The figures have not been adjusted to use 28 instead of 26 lots.

[4]In the meantime, the Legislature approved RCW 82.02.050.090 in 1990. The statute allows impact fees for municipal services. These fees can be imposed directly, subject to the safeguard provisions of the sections of the statute. An added twist in the new legislation is that the statute now defines "proportionate share" in RCW 82.02.090(5). The definition differs from that used by the parties here. This new definition is more closely aligned with "fair share" as used by the parties, as it requires costs of the improvements as being "reasonably related" to the new development.

On July 9, 1990, following the issuance of the revised traffic mitigation reports, Castle Homes and the City engaged in discussions to resolve potential issues related to the appeal of the determination of significance. There is much dispute as to what was said at the meeting, as indicated by the minutes of various City Council meetings. For purposes of the administrative appeal, these allegations were not reviewed by the hearing examiner or the judge.[5]

On July 24, 1990, Castle Homes and the City entered into a stipulation to withdraw the appeal of the determination of significance because they agreed on mitigated impact fees. Later, on September 20, 1990, a concomitant agreement was signed by Castle Homes and the City resolving the issues of that appeal. These voluntary agreements granted preliminary approval of the Castle Crest II plat and included that impact mitigation for traffic purposes would be advanced by Castle Homes in an amount of $3,000 per lot at the time of final approval of Castle Crest II, or a total of $84,000. This $84,000 was to be reduced by a credit amount, originally an estimated $10,000, for street improvements bordering the Castle Crest II development benefiting the City but undertaken by Castle Homes off site of its development.

Section 9 of the executed concomitant agreement allowed only the City Council to modify or amend the agreement after approval. The same section of the concomitant agreement also included a provision regarding recovery of costs and attorney fees should any issue go to court.

Some 9 months later at a June 25, 1991, City Council meeting, the City undertook review of the Castle Crest II project for final approval. At this meeting Castle Homes requested a revision or amendment of the concomitant agreement by the City Council. Specifically, the request was to reduce the traffic mitigation impact fees which were to be charged to Castle Homes at the time of final plat

---

[5]It was reported that the City's then-current mayor stated to the city attorney that she would not accept less than $3,000 per lot, or the project could be held up for years. This was never fully explored by the parties.

approval.[6] Although it did not have to do so, the City Council chose to approve the final plat, subject to an oral agreement to grant a hearing on the impact fees. On July 9, 1991, the City Council granted final approval of the plat by resolution 360. The City Council and the developer agreed that Castle Homes would deposit the $3,000 per lot fee with the City, less a $10,000 credit for offsite traffic improvements with an additional understanding that the City would hold a public hearing. At this hearing factual evidence regarding the fairness of the dollar amount would be heard as to related costs and the fair share of developer contributions to the traffic impact fees.

At its August 13, 1991, meeting, the City Council adopted resolution 361 which provided that the City would convene a public hearing to review the underlying factual support of the $3,000 per lot impact fee. It also provided that the City should present factual information supporting its claim that the $3,000 per lot fee represented a *fair share* of developer contributions to those *traffic impacts directly related* to the Castle Crest II project. The resolution also provided that if the factual evidence showed that the assessment exceeded *development related impacts*, the City would refund those amounts which did not reflect the fair share due from Castle Homes.[7]

On January 9, 1992, a hearing was convened before a special hearing examiner. At the hearing, evidence was produced by traffic engineering experts representing both the City and the developer as well as argument from their attorneys. At this hearing it was discovered that many of the monetary impact fee figures in the City's various traffic studies were based on a 26-lot development rather than 28. However, the City's expert testified as to the cumulative

---

[6]The City's mayor admitted that she undertook, at the city attorney's suggestion, to take care of the impact fees as an administrative procedure rather than let the City Council legislate the fees.

[7]Before passing the resolution, the City Council specifically discussed whether to keep the term "fair share" in the resolution, and its meaning versus "proportional share" was discussed.

effect of all of the developments in the area and the result-
ing charges on a proportional share basis. Castle Homes'
expert testified as to the limited amount of traffic impact
from Castle Crest II as most of it would exit directly into
Mountlake Terrace. At most, 25 percent of the traffic would
enter the City's street system, with only 8 percent staying in
the City for more than two blocks. When compared with the
other new developments in the City, this amounted to a
lesser amount than the other developments.[8]

The expert for Castle Homes explained and presented ev-
idence on the "fair share" approach to the impact fees. Al-
though at one point the expert was talking about an approxi-
mate amount of $1,100 per lot, the "bottom line" of the
evidence, using the City's own studies, was that a fair share
payment for the direct traffic impacts onto the City's streets
would be approximately $962 per lot.

Carr, the City's traffic expert, testified, "It's only because
of the traffic increases, as [cumulative] effect of all these
developments, I think that, you know, that I'm suggesting
you need to consider, somehow, funding improvements to
correct those deficiencies." Later, the City's expert admitted
that the "fair share" direct result of additional traffic from
Castle Crest II would be $42,000 from his first report, and
$25,000 from the "bare bones" report. He went on to testify
that the "proportional share" approach, as understood and
used by the parties, was better suited to these development
projects, because contributions would be received from the
developer to correct the existing traffic problems in the city.[9]
Carr also admitted that this "proportional share" approach
does not represent any traffic distribution analysis.

About two-thirds of the way through the hearing, the
special hearing examiner stated the following:

---

[8]It was pointed out that one of the developments closer to the "heart" of the City
was issued a DNS and did not pay any impact fees, while the studies indicated that
the resulting increase in traffic to the City from that development was almost 100
percent.

[9]The meaning of the term or words "fair share" in the resolution is, in part, at
the heart of the appeal, especially in regard to the use of the terms "fair share" and
"proportional share" as used to determine the amount due from developers.

You know, I personally . . . I've [got] some concerns as Hearing Examiner about the appropriateness of changing conditions on plat after the preliminary approval's been issued in the first instance. And if I were to go that line, I would just simply say, "It's inappropriate to consider changing that dollar amount period. The dollar amount was set with the preliminary plat and that's it. You either record it with that or you lose." The City Council hasn't taken that posture. I have been asked to conduct a Hearing for the purpose of telling the City Council whether or not the basis for the figure that was arrived at to begin with is factually sound, or something like that. I've lost track of the term right now. And I do not intend to get into anything other than that. I'm not going to get into whether or not the City even ought to be considering doing this, because it's not what they've asked me to hear tonight. So, I don't think we are also getting into a Sepa [sic] basis for this. We're not going back to re-determine whether or not there was authority for imposing a mitigation at all. We're looking for the factual basis for the dollar amount. That's all. Well, plus the credit thing.

The special hearing examiner held: "Well, I'm going to rule that the use of the phrase 'Fair Share' by the Council in Resolution 361 may or may not be synonyms [sic] with Mr. Carr's use of the term 'Fair Share' in his materials."

In his decision the special hearing examiner recommended that the City Council not disturb the $3,000 per lot traffic mitigation fee. The reasoning was based on the cumulative effect of the traffic of all the new subdivisions. The examiner held that any one (additional) car was going to affect the streets and their safety. The special hearing examiner also recommended that an additional $9,369.50 be refunded to Castle Homes as a credit for offsite road developments, but rejected a request for a credit for two offsite streetlights.

At its January 28, 1992, meeting, the City Council adopted the special hearing examiner's recommendations, effective January 29, 1992. This was done by resolution 370 and specifically included a notice of a right to appeal. On February 6, 1992, Castle Homes filed a Petition for a Writ of Certiorari, which was granted by the Superior Court on February 26, 1992. In April, the City filed a return to the Writ and in the alternative made a motion that the action be dismissed. In

December 1992, argument was heard by the trial court. No record of the argument was made. The trial court issued an oral decision denying the motion to dismiss but found that the City Council's decision declining to refund any traffic impact mitigation fees was not arbitrary, capricious, or unlawful. The parties indicate the trial court relied primarily on the majority decision in *Henderson Homes, Inc. v. Bothell*, 67 Wn. App. 196, 834 P.2d 1071 (1992),[10] and found that the challenge to the impact fees was untimely.

Additionally however, the trial court held that the City's decision to withhold any refund amount until all appeal periods had passed was contrary to law. The court ordered the City to refund the amount due. Further, the court ordered a remand to the City to hold a hearing regarding a potential refund for two offsite streetlights installed by Castle Homes, an issue which has since been resolved. The court reserved arguments pertaining to attorney fees until the final order was presented.

On January 14, 1993, the parties appeared before the trial court for presentation of the final order and to argue attorney fees issues. The court found that both parties were prevailing parties and found each to be responsible for its own fees and costs. Castle Homes filed a Notice of Appeal to this court; the City cross-appeals the denial of attorney fees and costs.

## DISCUSSION OF THE CASE

■ The parties do not dispute the standard of review in this case. The review of the City's actions through the City Council is governed by RCW 7.16.120, and is limited to the record before the agency. This court will reverse the determination only if the findings, conclusions, and decisions are (1) affected by error of law; (2) clearly erroneous (in view of the record and the public policy contained in the authorizing legislation); or (3) arbitrary and capricious. *See Sargeant v.*

---

[10]Since this case was argued in this court, the Supreme Court has reversed the decision in *Henderson Homes, Inc. v. Bothell*, 124 Wn.2d 240, 877 P.2d 176 (1994). The effect of this opinion is discussed *infra*.

*Department of Labor & Indus.*, 46 Wn. App. 30, 32, 728 P.2d 1095 (1986). Therefore, we first determine whether the decision regarding the underlying factual support for the impact fees per lot exacted by the City was arbitrary, capricious, or unlawful.

Brier resolution 361 states in significant part:

A RESOLUTION OF THE CITY OF BRIER, WASHINGTON, PROVIDING FOR A HEARING ON TRAFFIC MITIGATION FEES REGARDING THE PLAT OF CASTLE CREST DIVISION NO. 2.

WHEREAS, at a regularly scheduled Brier City Council meeting, held on July 9, 1991, the City of Brier City Council voted to grant final plat approval to the Plat of Castle Crest Division 2; and

WHEREAS, the Council did then determine to schedule a hearing to review the factual support of mitigation fees deposited by the developer into the City's six-year traffic impact mitigation fee account; and

WHEREAS, the developer has made such deposit, in reliance on the City's action to grant final plat approval subject to the right of the applicant to a hearing; now, therefore,

BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF BRIER, WASHINGTON, AS FOLLOWS:

1. The City Council shall convene a public hearing to review the factual support of impact fees advanced by the developer in an amount of $3,000 per lot.

2. At said hearing, the City's traffic consultant shall present factual information used by the City to assess, in support of, the $3,000 per lot fee, as it relates to the *fair share of developer contributions to direct traffic impacts related to the applicant's project.*

3. If the factual evidence shows that said assessment exceeds *development-related impacts,* a refund shall be made to the applicant to assure that monies collected *reflect the fair share due from the applicant for development-related traffic impacts.*

PASSED BY THE CITY COUNCIL OF THE CITY OF BRIER and signed into authentication this 13th day of August 1991.

(Italics ours.)

The minutes of the August 13, 1991, City Council meeting reflect that there had been some changes made in the resolution hammered out between the attorneys for the City and Castle Homes. The second part of the sentence of the paragraph numbered "2" had been removed. The attorney for the City indicated he did not have objections either way. The City

Council discussed its concern about the term "fair share" and referred to it as a technical term used by the traffic consultants. The City Council then discussed the difference between "fair share" and "proportional share". The motion was then made to adopt resolution 361 specifically keeping the term "fair share" as originally put in the resolution.

The parties both claim that the impact fee was exacted under RCW 82.02.020. In actuality, the underlying statutory authority for mitigation of impact fees comes from the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C. However, RCW 82.02.020 does not prohibit voluntary agreements to collect the payments to mitigate the direct impacts. RCW 82.02.020 provides in part:

> This section does not prohibit voluntary agreements with counties, cities, towns, or other municipal corporations that allow a payment in lieu of a dedication of land or to *mitigate a direct impact* that has been identified as a consequence of a proposed development, subdivision, or plat.

(Italics ours.) Thus the statute provides that impact fees are not prohibited where paid pursuant to "voluntary agreements" specifically to mitigate a direct impact that has been identified as a consequence of a proposed development.

■ Castle Homes correctly argues that under the rationale of *Cobb v. Snohomish Cy.*, 64 Wn. App. 451, 458-59, 829 P.2d 169 (1991), *review denied*, 119 Wn.2d 1012 (1992), mitigation fees paid pursuant to a "voluntary agreement" cannot be utilized to correct offsite roadway deficiencies which are not the *direct* consequence of impacts of the development. In *Cobb*, Snohomish County required the developer to contribute impact mitigation fees for the correction of deficiencies in travel lanes where the traffic engineering studies showed no traffic contribution. Castle Homes contends that *Cobb* mandates an analysis of the directional distribution of traffic impacting municipal streets in order for the government to prove that the mitigation fees are directly related to the development. In *Cobb*, overall assessment of the entire intersectional impacts was held to be illegal under RCW 82.02.020.

Although the City is correct in claiming that *Cobb* generally supports resolution of fee mitigation issues by negotiation and agreement, the difference between the facts in *Cobb* and those here is that here the City Council specifically allowed a revisitation of the factual determination behind the $3,000 per lot impact fee being assessed at the time of final plat approval. The statute authorizing "voluntary agreements" does not, in and of itself, provide the authority to impose the fees. SEPA is the grant of authority for mitigating the environmental impacts of a plat.[11] Under RCW 82.02.020, a city must identify the development-specific impacts to be mitigated. A review of the record clearly points out that the fees being charged to mitigate traffic woes were being based on a cumulative impact of all the new subdivisions, not the specific impact of the Castle Crest II development. The City's adoption of the decision of the special hearing examiner is a clear violation of the plain and unambiguous language of RCW 82.02.020.

Moreover, a plain reading of the "charge" of the City Council in resolution 361 for a hearing on the factual support of the fee exacted indicates that at that time the City Council was consciously choosing to use the "fair share" approach.

As set forth in the conclusions of the special hearing examiner:

> Any additional traffic on these roads in their present condition exacerbates the inadequacy [of the roads], even if only one car is involved. . . .
>
> . . . The need is caused by the new subdivisions, individually and collectively. If no additional traffic were placed upon the affected roads, there would not be a need for improvements (the current traffic levels being so low). It is the new traffic which creates the need for the improvements. Thus, the new subdivisions can legitimately be expected to bear the entire cost.

These conclusions disregard the charge of the City Council's resolution and the direct impact required under RCW

---

[11]In 1992 the Legislature passed RCW 82.02.100 which provides that a person who is required to pay a fee under SEPA for system improvements shall not be required to pay a fee under RCW 82.02.050.090 for those same improvements.

82.02.020. The record clearly points out that most of the traffic from Castle Crest II will enter Mountlake Terrace directly, or within a short distance. The traffic studies produced by both the City and Castle Homes reveal that the traffic entering the City's street system from Castle Crest II would not significantly impact the levels of service of the streets, especially when compared with other developments. There was testimony by both experts that whether new development occurs or whether there is no development at all, the need for safety improvements on the City's streets would remain.

Further, the traffic experts for both parties testified at the hearing that the "fair share" approach results in a lesser impact fee. The City's expert agreed as to what the amount would be under the "fair share" approach, but then indicated his belief that a proportional share approach was better for the City. The special hearing examiner disregarded the mandate of the City Council and the statute. In that regard his decision was arbitrary and capricious and in derogation of the law.

Under *Cobb v. Snohomish Cy.*, 64 Wn. App. at 457, voluntary agreements under RCW 82.02.020 are permissible only to exact fees to pay for improvements " 'reasonably necessary as a direct result of the proposed development or plat.' " It is incumbent under the statute and case law that the City show the required improvements were reasonably necessary "to mitigate the direct impact of the development." *Southwick, Inc. v. Lacey*, 58 Wn. App. 886, 895, 795 P.2d 712 (1990). If the City cannot make that showing, the assessment is invalid. *See R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 409, 780 P.2d 838 (1989).[12]

The City argues that the case of *Miller v. Port Angeles*, 38 Wn. App. 904, 691 P.2d 229 (1984), *review denied*, 103 Wn.2d 1024 (1985) eliminates any argument that general improvements are not direct impacts. However, if the City is arguing that *Miller* eliminates the requirement that impact

---

[12]*Cf. Henderson Homes, Inc. v. Bothell*, 124 Wn.2d 240, 877 P.2d 176 (1994); *Trimen Dev. Co. v. King Cy.*, 124 Wn.2d 261, 877 P.2d 187 (1994).

fees must directly relate to the development and that the fees may exceed those direct impacts it is incorrect.[13] *Miller*, like many other cases cited, sets forth the test that a municipality must demonstrate that the need for improvements "arose directly from the development" and that the developer is "not required to pay more than their share of the cost." *Miller v. Port Angeles*, 38 Wn. App. at 910. In *Miller*, the court pointed out that 82 percent of the cost of the regional improvements necessary to serve regional needs was paid by Port Angeles. This acknowledged that only 18 percent of the projected total cost was directly related to the impact on the project. Here the City did not acknowledge that it should pay for any of the offsite improvements in its street system. In arguing about the factual basis for the amount charged, the City specifically said it had completed the study of Donald Carr, P.E., its traffic expert, which had concluded there would be substantial impacts *on a cumulative basis*. The City is using a proportional share approach where it would charge the developers for the full amount of the cost, albeit proportionally by the number of lots. This does not take into account the direct impact of each separate subdivision location and the differing street distribution impacts of each. As such the decision cannot stand.

The City also argues that Castle Homes is estopped to claim that the City failed to abide by RCW 82.02.020 because it signed two voluntary agreements in which it agreed to pay the $3,000 per lot traffic impact mitigation fee. It relies on the cases of *Henderson Homes, Inc. v. Bothell, supra*, and *Trimen Dev. Co. v. King Cy.*, 65 Wn. App. 692, 829 P.2d 226 (1992), *aff'd*, 124 Wn.2d 261, 877 P.2d 187 (1994). Both of these cases were recently reviewed by our Supreme Court and do not support the City's view.[14]

█ On its review of *Henderson Homes*, the Supreme Court held that a 3-year statute of limitations governs a devel-

---

[13]*See* RCW 82.02.020; *Henderson Homes, Inc. v. Bothell*, 124 Wn.2d at 242-44.

[14]*Henderson Homes, Inc. v. Bothell*, 67 Wn. App. 196, 834 P.2d 1071 (1992), *rev'd*, 124 Wn.2d 240, 877 P.2d 176 (1994); *Trimen Dev. Co. v. King Cy.*, 65 Wn. App. 692, 829 P.2d 226 (1992), *aff'd*, 124 Wn.2d 261, 877 P.2d 187 (1994).

oper's challenge to the underlying legality of a voluntary agreement to pay impact mitigation fees under RCW 82.02.020. *Henderson Homes,* 124 Wn.2d at 247-48. There, as here, the developer signed a voluntary agreement but challenged its legality under RCW 82.02.020. When impact mitigation fees are properly assessed as the Supreme Court upheld in *Trimen Dev. Co. v. King Cy., supra,* they are an appropriate alternative to the dedications of lands. However when exacted without limitation to the direct impact, they are not appropriate and are in derogation of the law. The doctrine of estoppel is available to innocent parties only. *Henderson Homes,* 124 Wn.2d at 249 (citing *Mutual of Enumclaw Ins. Co. v. Cox,* 110 Wn.2d 643, 650-51, 757 P.2d 499 (1988)). Here, like in *Henderson Homes,* the City does not have the requisite clean hands, because the City has violated RCW 82.02.020.

■ Even if the City had an estoppel claim, it waived the argument by its own resolutions. The City Council approved the final plat of Castle Crest II *subject to* its agreeing to reopen the factual underpinnings of the decision to exact $3,000 per lot in mitigation fees. Resolution 370, the resolution in which the City Council adopted the decision of the special hearing examiner, was issued January 29, 1992. The resolution included a notice to Castle Homes of the right to appeal the decision of the City Council within 10 days. Castle Homes did so by filing a petition for writ of certiorari on February 6, 1992.[15]

---

[15]A waiver is generally defined as the voluntary relinquishment of a known right. *Seattle-First Nat'l Bank v. Westwood Lumber, Inc.,* 65 Wn. App. 811, 826, 829 P.2d 1152, *review denied,* 120 Wn.2d 1010 (1992); Restatement (Second) of Contracts § 84 cmt. b (1981). Here, at its meeting of July 9, 1991, the City Council discussed its options as to the approval of the final plat. The city attorney warned the City Council about opening up the impact fees mitigation issue. The options discussed were to (1) approve the final plat subject to the concomitant agreement as is; (2) approve the final plat as is, but agree to open up the impact fees issue by providing for a public hearing to determine if there was a factual basis for the imposition of the amount of the impact fee; or (3) refuse final approval until the issue of the impact fees could be settled. The City Council decided to reopen the mitigation of impact fees issue by looking into the factual basis for charging the $3,000 per lot fee. This intentional action waives any estoppel argument the City might have had, had it merely approved the plat as it was without opening up the impact fees issue.

The City did not have to grant the request to reopen or amend the concomitant agreement. The City Council made a deliberate decision to grant the developer a public hearing on the basis of the impact mitigation fees. Even though the developer "lost" this hearing, the City then allowed the developer to appeal from the decision. It cannot now claim that the developer is estopped from challenging the stipulation or concomitant agreement when the City Council itself reopened the determination which could have resulted in the refund of the fees had the hearing examiner, the City Council, or the Superior Court followed RCW 82.02.

The City cross-appeals the determination of the trial court that each party should pay its own fees and costs. It also requests fees and costs on appeal pursuant to RAP 18.1. The trial court determined that both parties were "prevailing parties" below and refused to award fees and costs.

Considering our decision that the impact fees were exacted in derogation of law, the decision below is reversed and the request by the City for fees and costs is denied. Castle Homes has specifically abandoned any argument that it is entitled to attorney fees, but does claim statutory costs. Statutory costs are so ordered.

The decision is reversed and remanded for a determination of the "fair share" amount of the impact fees based on the correct number of lots.

SCHOLFIELD and KENNEDY, JJ., concur.