Honorable Bill Finkbeiner State Senator, 45th District P. O. Box 40445 Olympia, WA 98504-0445
Dear Senator Finkbeiner:
By letter previously acknowledged, you have asked for our opinion on a question we have paraphrased as follows:
Where a city has entered into an agreement with a homeowner in thecontext of issuing a development permit that defers the homeowner'sobligation to install sidewalks until the city requests theirinstallation, does RCW 82.02.020 allow the city to require that thehomeowner either install the improvements, extend the agreement for anadditional term, or pay the city a "fee-in-lieu of installing theimprovements" equal to 75% of the installation cost, which fee would beused to fund right-of-way improvements throughout the city?
 BRIEF ANSWER
Assuming a city can demonstrate that obligations under a development agreement with a homeowner "mitigate a direct impact that has been identified as a consequence of a proposed development" and that payment under such an agreement "is reasonably necessary as a direct result of the proposed development", RCW 82.02.020 does not prohibit the city from presenting a homeowner with viable options to satisfying his or her obligations under the initial agreement, including the choice of renewing the agreement for an additional term.
 ANALYSIS
Your question concerns the validity of street improvement agreements between homeowners and a city[1] creating an obligation on the part of a homeowner to make such improvements in the context of obtaining approval of permits from the city to construct or substantially remodel a home. From your letter and its attachments, we understand that such agreements originally provided homeowners with the option of either immediately installing the improvements at their own cost or paying the city to make the improvements upon request of the city within fifteen years of signing the agreement. Several of the development agreements are reaching the end of the fifteen-year deferral period. The city council recently voted to present the following three options to homeowners who are party to agreements approaching the end of deferral:
(1) Install the required improvements;
(2) Sign a new 15-year agreement; or
(3) Pay a "fee-in-lieu" equal to 75% of the cost of installing the improvements, which would be used to fund right-of-way improvements throughout the city.
You have asked whether a city requirement that homeowners party to street improvement agreements choose one of these three options at the end of the deferral period is valid under RCW 82.02.020.
RCW 82.02.020 provides in relevant part:
[N]o county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings . . . .
This section does not prohibit voluntary agreements with counties, cities, towns, or other municipal corporations that allow a payment . . . to mitigate a direct impact that has been identified as a consequence of a proposed development, subdivision, or plat. . . . Any such voluntary agreement is subject to the following provisions:
(1) The payment shall be held in a reserve account and may only be expended to fund a capital improvement agreed upon by the parties to mitigate the identified, direct impact;
(2) The payment shall be expended in all cases within five years of collection; and
(3) Any payment not so expended shall be refunded with interest at the rate applied to judgments to the property owners of record at the time of the refund; however, if the payment is not expended within five years due to delay attributable to the developer, the payment shall be refunded without interest.
No county, city, town, or other municipal corporation shall require any payment as part of such a voluntary agreement which the county, city, town, or other municipal corporation cannot establish is reasonably necessary as a direct result of the proposed development or plat.
1. The City's Improvement Agreements Are Governed By RCW 82.02.020, AsThe Agreements Involve A "Tax, Fee, Or Charge" As Contemplated By TheStatute
As a threshold matter, we must first determine whether the agreements in question involve a "tax, fee, or charge" within the meaning of RCW82.02.020. Several Washington cases have held that conditions similar to those discussed in your request were within the statute. For example, RCW82.02.020 was found applicable where a condition required frontage improvements for drainage along an adjacent boulevard. United Dev. Corp.v. City of Mill Creek, 106 Wn. App. 681, 698-99, 26 P.3d 943 (2001). Similarly, payment of $3,000 per lot or provision of offsite traffic improvements was a tax, fee, or charge under the statute. Castle Homes Dev., Inc. v. City of Brier, 76 Wn. App. 95, 882 P.2d 1172 (1994). Likewise, RCW 82.02.020 was applicable where an ordinance required developers to construct onsite recreational facilities or pay a fee in lieu thereof. View Ridge Park Assocs. v. City of Mountlake Terrace,67 Wn. App. 588, 839 P.2d 343 (1992). Based on the similarity between the street improvement condition you reference in your query and these three examples, we conclude that RCW 82.02.020 is applicable to the case at hand.
2. Whether The City's Agreements Require Payments That Are ReasonablyNecessary As A Direct Result Of Proposed Development Is A Question OfFact That Cannot Be Addressed By This Opinion
Questions seeking to resolve issues of fact are outside the appropriate scope of an Attorney General Opinion. Consequently, the issue of whether the agreements in question require payments that are reasonably necessary as a direct result of proposed development is a question of fact that cannot be addressed herein. Should the legality of these agreements be challenged, the City would have the burden to prove this point. See IslaVerde Int'l Holdings v. City of Camas, 146 Wn.2d 740, 755-56, 49 P.3d 867
(2002) ("[U]nder RCW 82.02.020 the burden of establishing that a condition is reasonably necessary as a direct result of the proposed development is on the City."). While we cannot resolve factual issues, we can discuss the general legal framework that the courts could apply.
The Washington Supreme Court recently invalidated, under RCW 82.02.020, a development condition imposed by the City of Camas. Isla Verde,146 Wn.2d at 765 (2002). Camas placed a condition on approval of a preliminary plat for a subdivision requiring that 30 percent of land to be developed be set aside as open space. The Court rejected the city's argument that it had satisfied its burden to prove the condition was "reasonably necessary as a direct result of the proposed development or plat" by making a conclusory legislative determination that set-asides were needed to mitigate for development. Isla Verde, 146 Wn.2d at 761. The court emphasized that conditions may not be imposed automatically but must be tied to a specific, identified impact of a development on a community. Id.; see also Henderson Homes, Inc. v. City of Bothell,124 Wn.2d 240, 877 P.2d 176 (1994) (payment of a pre-set $400 per lot as a park mitigation fee found invalid). The Court found nothing in the record showing any relationship between the 30 percent open space requirement and impacts of the proposed development. IslaVerde at 762. Neither did the record explain why 30 percent was chosen as the amount of open space needed. Id. at 763.
In Isla Verde, the Court contrasted Camas's impermissible development condition with a King County ordinance assessing park development fees as a condition of plat approval in lieu of dedication of land. Id. at 760-61. In Trimen Dev. Co. v. King Cy., 124 Wn.2d 261 (1994), the Court approved the King County park fee system based on evidence in the record that such fees were directly tied to the development in question. The County had conducted a comprehensive assessment of park needs in a report prepared prior to the developer's application for subdivision approval. The report indicated a deficit of park acres in the area of the proposed developments and projected a greater deficit as a result of population expansion. The dedication of open space in the Trimen case would have resulted in an amount of park land roughly proportional to that which the report showed would be needed for the developments' estimated population. In turn, the "fee in lieu of dedication" was calculated based on zoning, projected population, and the assessed value of the land that would have been dedicated or reserved. The court concluded that because the fees in question were based on a comprehensive report of park needs, as well as the assessed value of the land that would have been set aside or dedicated, the park fees were "reasonably necessary as a direct result of the proposed development". Isla Verda, 146 Wn.2d at 761.
3. Whether Payments Under The City's Street Improvement Agreements AreExpended To Fund A Capital Improvement To Mitigate An Identified, DirectImpact Of Proposed Development Is A Question Of Fact That Cannot BeAnswered By This Opinion
As explained above, questions of fact are outside the appropriate scope of an Attorney General Opinion. The issue of whether payments under the street improvement agreements comply with RCW 82.02.020's requirement that such payments fund capital improvements to mitigate an identified, direct impact of the development in question is primarily factual. It therefore cannot be answered herein. However, as we did above, we can provide examples of fees upheld as well as invalidated under the statute in question.
In Trimen, the Court upheld a park development fee, noting with approval that the King County ordinance required that the collected fee "be appropriated only for acquisition and development of open space, park sites and recreational facilities within the park service area whereinthe proposed subdivision is located" in order to benefit the particular subdivision. Trimen, 124 Wn.2d at 272 (citing KCC 19.38.070; emphasis added). The Court contrasted the King County fee with the one it invalidated in Henderson Homes. Trimen, 124 Wn.2d at 273. In that case, Bothell violated RCW 82.02.020 because it was spending developers' impact fees for general park use, rather than mitigating site-specific impacts.Id. Similarly, two cases invalidated mitigation fees paid pursuant to voluntary agreements for correction of off-site roadway deficiencies that were not the direct consequences of development impacts. Cobb v.Snohomish Cy., 64 Wn. App. 451, 829 P.2d 169 (1991); Castle Homes andDev., Inc. v City of Brier, 76 Wn. App. 95, 882 P.2d 1172 (1994).
4. The City's Street Improvement Agreements, Including Those That WouldExtend The Term For An Additional Fifteen Years, Are "Voluntary" UnderRCW 82.02.020
The purposes for which the city can "require" payment under a "voluntary" development agreement are limited by RCW 82.02.020. The statute provides that any payments the city requires for purposes of mitigating a direct impact as a consequence of development is subject to the limitation that the funds "may only be expended to fund a capital improvement agreed upon by the parties to mitigate the identified, direct impact". RCW82.02.020(1). Similarly, the city is prohibited from "requir[ing] any payment as part of such a voluntary agreement which the . . . city . . . cannot establish is reasonably necessary as a direct result of the proposed development or plat." RCW 82.02.020.
The Supreme Court has set a fairly low bar for agreements to be considered "voluntary" under RCW 82.02.020. In Trimen, the court explained that "in order to be voluntary, `an agreement must at least present the parties with a viable choice.' "Trimen, 124 Wn.2d at 272
(quoting Cobb v. Snohomish Cy., 64 Wn. App. 451 at 464) (concurrence/dissent). In the context of development fee agreements, a viable choice means that the developer has the option of either paying the fees in question (assuming they comply with RCW 82.02.020) or losing permit approval. Id. at 271. Under this standard, we presume that the city gave homeowners a "viable choice" in the original agreements, which therefore are "voluntary" under RCW 82.02.020.[2]
The choices recently provided by the city to those with existing agreements reaching 15-year maturity appear to be "viable" as well. The agreements at issue provide property owners with three options. Two of those options (installing the improvements or signing an extension agreement under which they could be obligated to pay those costs later) simply extend the term of the "now or later" choice proffered in the original agreements. The third option, paying a "fee-in-lieu" that is equal to 75% of the costs of improvements, would generate funds to be used for making improvements throughout the city. This fee appears similar to others invalidated by courts under RCW 82.02.020 in that it would fund general, off-site improvements. See Henderson Homes,124 Wn.2d 240; Cobb, 64 Wn. App. 451; Castle Homes, 76 Wash. App. 95. Regardless of whether the city could offer this option in isolation, we conclude that in this context, it is not "requiring" a homeowner to make such a payment, as she has other choices available under the agreement that presumably would meet the statutory requirement. We therefore conclude that these agreements are "voluntary" under RCW 82.02.020.
5. Duration Of Voluntary Agreements Is Not Limited To Five Years UnderRCW 82.02.020
As you correctly surmise, RCW 82.02.020 requires that a payment collected under a voluntary agreement be expended in all cases within five years of collection. This requirement does not, however, limit the terms of voluntary agreements to five years. Nothing in the statute addresses for how long an agreement could defer payment. What is clear is that once payment has been made, the collecting entity must expend the funds within five years.
In summary, RCW 82.02.020 allows a city to enter into a development agreement with a homeowner that is longer than five years in duration and presents options as to how obligations are to be discharged. Whether payments and improvements made under such agreements satisfy RCW 82.02.020's requirements regarding the nexus between such obligations and the impact of development is a question of fact not answered by this opinion, however.
We trust the foregoing will be of use to you.
Sincerely,
 AMY MACKENZIE Assistant Attorney General
[1] Your request makes reference to ordinances and policies of the City of Kirkland. Our advice is intended as general assistance to legislators in interpreting current statutes and should not be construed as a comment on any particular city's ordinances or policies.
[2] Again, this Opinion does not reach any conclusion regarding whether the improvements in question were "reasonably necessary as a direct result of the proposed development or plat," which would necessarily be a threshold question to be addressed when demonstrating compliance of an agreement with RCW 82.02.020.