[No. 31191. Department One. February 20, 1950.]

JAMES LARKINS et al., *Appellants,* v. ST. PAUL AND TACOMA
LUMBER COMPANY, *Respondent.*[1]

*Earl V. Clifford,* for appellants.

*Grosscup, Ambler & Stephan* and *Pendleton Miller,* for
respondent.

BEALS, J.—Plaintiffs in this action, James and Mary Lar-
kins, husband and wife, with their large family of children,
moved from Duluth, Minnesota, to Tacoma, during the year
1946. For approximately twenty years prior to this time,
Mr. Larkins had been in the employ of a railroad, and, as
a side line, had bought and sold scrap metal.

The defendant, St. Paul & Tacoma Lumber Company, a
corporation, has for many years been engaged in the logging

[1]Reported in 214 P. (2d) 700.

and lumber business in the state of Washington, its principal place of business being in Tacoma. The corporation conducts extensive operations in and around Ohop post office in Pierce county and elsewhere.

During the month of March, 1947, plaintiff James Larkins (who will be hereinafter referred to as plaintiff or appellant), having been informed that the defendant, in the course of its business, accumulated a considerable quantity of scrap metal, called at defendant's office for the purpose of offering to buy the scrap. He was referred to Mr. Zoffel, superintendent of operations, and interviewed him at Ohop, with the result that it was agreed that plaintiff could purchase designated scrap metal, paying $3.50 a gross ton therefor.

Plaintiff commenced to operate under this agreement and continued to remove scrap metal until September, 1947, when he was notified that defendant had made other arrangements for the sale of its scrap.

December 17, 1948, plaintiffs filed their complaint in this action, alleging that defendant had for many years been operating in and around Ohop, its plant including a repair shop for servicing locomotives, cranes, steam shovels, and other heavy machinery; that defendant owned a railroad in the vicinity, and, in the course of its operations over the years, had accumulated a large amount of scrap metal.

The complaint further alleged that, during the month of March, 1947, as the result of negotiations between the parties, the defendant "orally sold, and the plaintiff James Larkins orally purchased said scrap, except for occasional items the defendant could use, for $3.50 per gross ton, to be paid as the scrap was removed"; that, between March 11, 1947, and September 30, 1947, pursuant to this contract, plaintiff removed and paid for over 384 gross tons of scrap; that, during the month of September, 1947, the defendant breached its contract with plaintiff by refusing to allow him to remove scrap from its properties; that, at the time of the breach of the contract, there was a large amount of scrap in and around Ohop; that, thereafter, defendant sold

on its own account over one thousand gross tons of scrap which plaintiff was entitled to remove, pursuant to his contract with defendant; that plaintiff had bought the scrap for resale and was able to realize a net profit of eighteen dollars per gross ton on the resale of the scrap, and that, by defendant's breach of its contract, plaintiff had suffered damage in the amount of $19,170.

For a second cause of action, plaintiff alleged that defendant still owned, in the vicinity of Ohop, over 203 gross tons of scrap which plaintiff was entitled to remove, under his contract, but which he had been forbidden to remove, to his further damage in the sum of $4,680.50.

Plaintiff demanded judgment against defendant for the amounts referred to above.

By its answer, defendant admitted that, in the course of carrying on its extensive business, some scrap metal had accumulated at its camp No. 1 near Ohop, and that, pursuant to an agreement between the parties, some of the scrap had been sold by defendant to plaintiff. Defendant denied any indebtedness to plaintiff, and, by way of a first affirmative defense, alleged that, by the sale of certain scrap metal to plaintiff, the agreement had been fully accomplished and terminated.

By way of a second affirmative defense, defendant alleged that any such contract as that relied upon by plaintiff in his complaint amounted to a contract for the sale of goods of the value of more than fifty dollars, and was a contract not to be performed within one year, and, therefore, was within the provisions of the statute of frauds and unenforcible unless in writing.

Defendant prayed for dismissal of the action.

By his reply, plaintiff denied the affirmative allegations contained in defendant's answer.

The case was called for trial before the court, sitting with a jury. At the close of plaintiff's case, the defendant challenged the sufficiency of the evidence introduced by plaintiff to support a verdict in plaintiff's favor. The trial court

sustained this challenge stating that the action would be dismissed.

Plaintiff's motion for a new trial having been denied, an order was entered denying plaintiff's motion for a new trial and dismissing the action with prejudice, from which order plaintiff has appealed.

Appellant makes the following assignment of errors:

"(1) The court erred in dismissing plaintiff's action.

"(2) The court erred in overruling plaintiff's motion for new trial."

As the action was dismissed at the close of appellant's case, the only evidence contained in the statement of facts consists of the testimony of appellant's witnesses on direct and cross-examination, and certain exhibits offered by appellant.

Concerning his conversation with respondent's employee, A. Zoffel, appellant testified:

"Q. What conversation did you have with him? A. Well, I says, 'Are you Mr. Zoffel?' He says, 'Yes, sir.' I said, 'Mr. Zoffel,' I said, 'You have got a lot of scrap laying around here.' I says, 'I am in the market for scrap,' I says, 'I would like to buy scrap from you.' He turned around and smiled and says, 'Have you ever been in the scrap business?' I said, 'Yes, yes, sir,' so he says, 'Well, what would you give me a ton?' I said to him, '$3.50.' Well, he thought it was a good idea, the way he spoke. He said, just like this, 'And anything we want saved you will save it for us?' And I said, 'Yes, sir.' 'And anything we don't want you can scrap it,' and I said, 'That is right,' and that is just the way the bargain went along. The first thing I done, there was a locomotive up on the passing track there. Q. Wait a minute. Have you told all the conversation? Was there any conversation regarding how much scrap there was there? A. Yes, sir. Q. And how long it had been there? A. The conversation—that kind of slipped my mind. I said to him, 'You have got a good many hundred tons, Mr. Zoffel,' and he says, 'You will think so. It will be more than 250,000 ton before you get through,' and I knew it wasn't there at Ohop, but it had to come from some place, and the way I looked at it, with all the machinery they had from day to day it was bound to accumulate a lot of it."

Appellant testified that, approximately two weeks after the conversation above quoted, he had another talk with Mr. Zoffel as follows:

"Q. Go ahead. What conversation did you have? A. I seen Mr. Zoffel and I says to him, 'There is somebody else getting scrap here, I hear, and I have seen them get out of here with scrap,' and I says, 'They ain't paying anything for the scrap,' and he said, 'All they take is the light stuff.' I says, 'I got to go to work and buy oxygen and acetylene and cut up the big stuff and them fellows are getting it for nothing.' 'Well,' he says to me, 'I tell you,' this was on Friday, 'Monday morning,' he says, 'I will have a letter to the effect that nobody else will take scrap here.' Sure enough, Monday he came back with a letter, and he says, 'Read that over,' and I read it over and he said, 'How is that?' And I said, 'It is fine with me, Mr. Zoffel,' and he patted me on the shoulder and he said, 'That is fine.' "

The letter referred to by appellant was introduced in evidence (exhibit No. 2), and read as follows:

"St. Paul & Tacoma Lumber Company
Established 1888
Tacoma, Washington
Camp No. 5
Ohop, Washington.
March 20th 1947.

"Mr. James Larkins,
Ferris Drive,
Tacoma, Wash.

"Dear Mr. Larkins:

"You have permission from the St. Paul & Tacoma Lumber Company, to remove and haul away from the Ohop camp at Ohop, Washington, all scrap iron at a price of $3.50 per gross ton. A receipt of scale weight and a check covering the same to be mailed to our office in Tacoma, Washington. Also, a copy of scale weight to be sent to superintendent of logging Camp No. 5, Ohop, Washington.

"All parts or pieces of equipment that can be used in our shop or operations are to be set aside in a pile designated by our master mechanic. Yours truly,
A. ZOFFEL,
Logging Superintendent.
[Signed] A. ZOFFEL."

Appellant continued to remove and pay for scrap metal from Ohop and adjoining territory until late in August or early September.

Appellant testified to another conversation with Mr. Zoffel, the date not being definitely fixed, as follows:

"Q. Was there any mention, again, of price, when you talked to Mr. Zoffel in regard to others taking scrap? A. Well, the only time—there was a time, I don't know just how it came about, but I believe it was the same time as I spoke to him about that letter. He says, 'I believe,' he says, 'you should give us more than that, at least $5.00 a ton anyway,' and I told him the price of oxygen and acetylene was quite a bit of money and there was lots of labor cutting up locomotives and skidders, and he says, 'Oh, that is all right. We will let it go at that.' "

At some date not clearly fixed by appellant, he saw some scrap metal in the neighborhood of respondent's camp No. 5, and, concerning this and other scrap, appellant testified as follows:

"Q. What conversation did you have with Zoffel? A. Well, the way it was, see, when I get done cutting a locomotive or a skidder, or anything like that, if I couldn't get to see Mr. Zoffel right away, without knowing what he wanted me to cut up next because they were saving parts of it, you understand,—sometimes I would be tied up for a couple of days, so I told him about it and he says, 'You go and see Alex Hyndman and,' he says, 'you tell him to tell you just exactly what there is and what you want.' I said, 'All right,' so I went back and told Mr. Hyndman and he said, 'It is a wonder he don't come and tell me about it.' [Colloquy.] Q. Go ahead. A. He said, 'Why don't they come and tell me about it?' I said, 'I will go back and see him about it,' and I went back and I says, 'Mr. Zoffel, Alex wants you to come down there and tell him just what you told me,' and Alex stood outside the shop and Mr. Zoffel stood right in front of the office, the train dispatcher's office, and he said, 'You go back and tell Alex whatever he says and does is all right with me,' and I said to Alex then, 'All right, Alex, then let's go around the whole place and see what there is and what there ain't,' and he said, 'I am too busy today,' and the following day I came in and I said, 'Alex, well, how about today?' And he said to me, 'I am putting in an air compressor here right now, and I have

my hands full and I am tied up and can't do nothing for you today,' and the following day he was too busy. I was too busy, too. I was wrecking what they call a track,—I don't know what they call it,—and I didn't have no scaffolds for the guy to climb up and burn this rig, and I stayed there myself with ropes and blocks so nobody would get hurt working on the rigging and so I couldn't go, and the following day I went to Alex and I said, 'How about today?' He said, 'Away we go, I am all ready for you.' "

Appellant testified concerning an examination of scrap made by Mr. Hyndman and himself, stating that Mr. Hyndman indicated the scrap which he could remove. Appellant then testified as follows:

"Q. Well, now, what conversation and with whom did you have it about going to Old Camp 2? A. Alex was the first man. He advised me to go to Old Camp 2. I didn't know where that was and I said that I would like to see Mr. Zoffel about it and a day or so afterwards I seen Mr. Zoffel and I said, 'What about that scrap at Old Camp 2?' 'Why,' he said, 'I would be glad to have you go up there and pick that up,' so I went up there and I couldn't get it out by truck, but there was a passing track alongside the main line there on which I could load the cars and ship by rail, so I told Mr. Zoffel I was going up there and take that out, and he was very glad to have me do that."

While appellant was working at camp No. 2, he received a message to telephone Mr. Zoffel, and, when he did so, the latter told appellant that, when he had finished removing scrap from camp No. 2, there would be no more scrap sold to him, respondent having made arrangements to dispose of the scrap to another.

On cross-examination, appellant testified as follows concerning his first conversation with Mr. Zoffel:

"Q. Just answer. What did you tell Mr. Zoffel? A. I wanted to buy his scrap. Q. When you say 'that scrap' what were you referring to? A. Everything concerning scrap. Q. Could you be a little bit more definite as to what you were buying? A. I didn't designate anything. I wanted to buy everything in general, whether locomotives, steam skidders or anything in the line of scrap. That is what I was looking for. . . . Q. And it was abandoned equipment

in 1947? A. Yes, it was in the scrap yard and that was designated as the scrap yard. Q. Did you have any idea of the quantity of it? A. Well, there was quite a few hundred tons there, and I got out nearly 300 ton myself."

Concerning the letter written by Mr. Zoffel (exhibit No. 2), appellant testified, on cross-examination, that the terms were satisfactory to him because it referred to "all scrap." On redirect examination, appellant testified that the letter was satisfactory because it included all scrap, and that it was written to him for the purpose of preventing other persons from removing scrap. On recross-examination, appellant testified that, on a pretrial oral examination outside of court, he had stated, under oath, that the letter exhibit No. 2, comprised the complete agreement between appellant and respondent.

Considerable evidence was introduced to show just what scrap metal had been seen by witnesses in the area in and around Ohop. Appellant also introduced evidence showing that he had paid in full for all of the scrap he had removed, and what profits he had made and estimated he would have made had the contract which he contended existed between the parties been carried out.

On cross-examination, appellant testified that he had verified and filed a complaint in another action which he had brought against respondent, based upon the same transaction which is the subject matter of this proceeding, and that, in the prior action, appellant had prayed for judgment for damages in the sum of three and one-half million dollars for breach of contract. Apparently, the prior action was abandoned.

A witness called by appellant, testifying as an expert, stated that he and appellant made an extensive tour of the Ohop area, and that appellant showed him considerable material which he told the witness had been sold to him as scrap. The witness testified that, in his opinion, a considerable portion of the metal which appellant called scrap was fit for use, and that probably between thirty and forty per cent of the articles which appellant had indicated as

scrap was merchantable or usable material and not properly designated as scrap.

 Examination of the record fails to disclose any agreement on the part of appellant to do anything save to remove designated scrap in accordance with instructions given him, set aside designated articles, and pay for scrap removed at $3.50 per gross ton. The letter signed by Mr. Zoffel, on behalf of respondent, grants appellant permission to remove designated scrap metal. It is a mere license.

Appellant argues that respondent made with him a binding contract to sell all scrap, basing his argument upon the conversations above quoted and the letter signed by Mr. Zoffel. Appellant then argues that there was, on his part, an implied promise to buy all the scrap, which promise amounted to a consideration for the promise to sell. Appellant also contends that, even though he made no direct promise to buy all the scrap, he gave to respondent, for the latter's benefit, an independent consideration for respondent's alleged promise to sell, and that the independent consideration bound respondent to a contract to sell all the scrap to appellant.

Appellant cites the case of *Lloyd v. American Can Co.*, 128 Wash. 298, 222 Pac. 876, in which this court said:

"Any contract containing a consideration is enforcible whether it is otherwise mutual or not. A promise from one party is sufficient to support that from another. Indeed, mutual promises are but a certain form of consideration. [Citing cases.]"

Appellant argues that

"Mutuality of obligation is not essential to the validity of a contract, nor is it necessary that a contract be binding on both parties so that an action may be maintained by one against the other."

In support of this contention, appellant cites 6 R. C. L. 686, Contracts, § 93. After stating that some courts have laid down too broad a rule to the effect that mutuality of obligation is essential to every contract, the text continues:

"But whatever the rule may be with respect to the specific enforcement of contracts, there can be no doubt that

if a contract is ever unenforceable in other ways because of the lack of mutuality, it is because such lack of mutuality creates a want of consideration. As a promise by one person is merely one of the kinds of consideration that will support a promise by another, mutuality of obligation is not an essential element in every contract. Therefore, to say the least, language which is susceptible of the interpretation that consideration and mutuality of obligation are two distinct elements lacks precision. Consideration is essential; mutuality of obligation is not unless the want of mutuality would leave one party without a valid or available consideration for his promise. The doctrine of mutuality of obligation appears therefore to be merely one aspect of the rule that mutual promises constitute considerations for each other. Where there is no other consideration for a contract, the mutual promises must be binding on both parties. But where there is any other consideration for the contract, mutuality of obligation is not essential."

■ The last sentence quoted above may be stated in reverse, as follows: *But where there is no other consideration for the contract, mutuality of obligation is essential.*

Appellant cites a number of decisions of this court, following the statement: "Other Washington cases holding contracts not unenforceable for lack of mutuality are the following: . . ." In the cases cited, this court held the contracts in question valid because of adequate consideration, mutual promises, legality of the contracts, or upon other sufficient legal grounds. The cases are not here in point.

In the case at bar, respondent assumed no obligation, its agents merely stating that they would, from time to time, indicate the scrap to be appropriated by appellant and the portions thereof not to be so appropriated. Appellant assumed no obligation whatever, save to pay the agreed price for the scrap which he took into his possession pursuant to allocations by respondent's agents.

Appellant argues that, by agreeing to cut the scrap at respondent's convenience, and to leave certain portions thereof which respondent desired to reserve, respondent obtained the benefit of some independent consideration.

The segregation of the scrap into two parts, one which appellant might appropriate and one which he might not, affords no basis for appellant's argument in this connection.

The trial court, to a considerable extent, based its ruling in respondent's favor upon the case of *Beckman v. Brickley,* 144 Wash. 558, 258 Pac. 488, which involved a contract, partly written and partly oral, for the sale of standing timber. Plaintiff Beckman sued Brickley and another, alleging that the defendants had breached a contract whereby they had agreed to sell to plaintiff white pine timber standing upon a described tract of land in the state of Idaho. This court held that the contract, being partly oral, was an oral contract, and that, as standing timber partakes of the realty, a contract for the sale of such timber must be in writing.

This court stated that a second ground for holding the contract void was that it was "wanting in mutuality." Concerning this phase of the case, we said:

"While the contract contains apt words of conveyance, which, standing alone, might pass a present title to the timber, yet a reading of the contract as a whole makes it clear that this was not the intent of the parties. The contract is awkward in its wording, and contains provisions seemingly contradictory, but it provides that the logs are to be scaled and accounted for before they are removed from the premises, that payments are to be made at the time of the scaling of each two hundred thousand feet, and the continuance of the contract is made to depend on the payment due upon the first 400,000 feet of logs in the manner provided by the contract. These provisions are inconsistent with the passing of a present title, and clearly show, we think, that such was not the purpose of the parties. Construing the contract as meaning that the title to the timber was to pass to the purchasers only after its severance from the land and the payment of the agreed purchase price, there is a want of mutuality in the contract. The purchasers make no direct promise to sever and pay for the timber, nor do we think that such a promise can be implied from the language they have used. The contract is permissive, and binds the purchasers only in the case they perform. In other words, it amounts only to a license to sever and remove the timber, uncoupled with an interest. As such, it was revocable at any time by the sellers, and they did

revoke, when they refused the appellant permission to perform it. These considerations are enforced, we think, when the contract is looked upon from another angle. Had the appellant refused to perform and the sellers brought an action against him for the breach, it would be difficult to find in the contract any promise upon which a recovery could be based."

In the case last cited, the second ground upon which this court held the contract void (lack of mutuality), is in point here.

In the case of *Brown v. Brew*, 99 Wash. 560, 169 Pac. 992, in affirming a judgment in favor of the defendant in an action brought to recover a commission on the purchase of timber, we said:

"Mutuality of obligation is not essential to a contract when there is other valid consideration, as unilateral contracts, based upon a sufficient consideration, are enforcible; but where, as is in this case, there is no other consideration but the promise, there must be mutuality to make a binding contract."

Other decisions of this court here in point are *Spokane Canal Co. v. Coffman*, 61 Wash. 357, 112 Pac. 383; *Mowbray Pearson Co. v. E. H. Stanton Co.*, 109 Wash. 601, 187 Pac. 370, 190 Pac. 330; *Osner & Mehlhorn v. Loewe*, 111 Wash. 550, 191 Pac. 746, and *Brewster Dist. Unit v. Monroe*, 117 Wash. 21, 200 Pac. 841.

Under the arrangement between the parties, as disclosed by the evidence before us, appellant was not obligated to remove and pay for any particular amount of scrap metal, and respondent was under no obligation to permit appellant to remove any definite amount of scrap. Either party was free to terminate the arrangement at any time, and the trial court correctly sustained respondent's challenge to the evidence introduced by appellant, denied appellant's motion for a new trial, and dismissed the action.

The judgment appealed from is, accordingly, affirmed.

SIMPSON, C. J., SCHWELLENBACH, GRADY, and DONWORTH, JJ., concur.