[No. 22254-0-II. Division Two. March 12, 1999.]

BENCHMARK LAND COMPANY, *Respondent,* v. THE CITY OF BATTLE GROUND, *Appellant.*

538

540

*W. Dale Kamerrer* of *Law, Lyman, Daniel, Kamerrer & Bogdanovich*; and *Brian H. Wolfe, City Attorney*, for appellant.

*LeAnne M. Bremer* of *Horenstein Bremer, P.S.*; and *Ronald A. Franz* of *Law Offices of Ronald A. Franz*, for respondent.

*Brent D. Boger* on behalf of Pacific Legal Foundation, amicus curiae.

*Stephen Harold G. Overstreet* on behalf of Building Industry Association of Washington, amicus curiae.

ARMSTRONG, J. — Benchmark Land Company sought to develop a 20-acre subdivision in the City of Battle Ground. As a condition of plat approval, the City required Benchmark to make half-street improvements to a street adjoining the subdivision on one side, even though the subdivision did not directly access the street. Benchmark challenged the condition with a land use petition under RCW 36.70C (LUPA) and also sought damages from the City pursuant to 42 U.S.C. § 1983 (1979) and RCW 64.40. The trial court ruled that the City had failed to show either an essential nexus or a rough proportionality between the impact of the subdivision and the need for half-street improvements. The damage claims were not resolved, but the court entered judgment for Benchmark on the LUPA claim. On appeal, the City contends that (1) Benchmark agreed to the half-street improvements, and (2) because a city ordinance provided the formula for half-street improvements, the City was not required to show by a site-specific

study the essential nexus and rough proportionality between the development and the half-street improvements. We affirm.

## FACTS

On November 14, 1994, Benchmark filed a preliminary plat application to develop a subdivision called Melrose Park. Benchmark's initial site plan included half-street improvements to North Parkway Avenue, which bordered the proposed subdivision to the east. Benchmark had been "informed" by the City that city ordinances require half-street improvements to be made to access streets fronting on a subdivision parcel. Battle Ground City Code (BGCC) 12.16.180, 12.16.240.

The preliminary plat's initial design included access to North Parkway from 14th Street, but the city engineer suggested, four days before the planning commission meeting, that the 14th Street access be eliminated. Benchmark revised its preliminary plat to eliminate the access to 14th Street, but did not eliminate the proposed half-street improvements.

The preliminary plat received approval from the planning commission in April 1995, subject to 10 conditions. While the half-street improvements were apparently discussed at the meeting, none of the conditions concerned the half-street improvements.[1] The city council approved the preliminary plat in May 1995, but did not reduce its findings to writing, as required by both the BGCC 16.103A.10 and RCW 58.17.110.

In August 1995, Benchmark told the City that it would not make half-street improvements to North Parkway. Benchmark contended that the half-street improvements were a "left over" from the original design in which the subdivision had 14th Street access to North Parkway.

In January 1996, the city council adopted findings of fact

---

[1]Half-street improvements apparently consist of pavement, curbs, gutters, sidewalks, and bicycle/pedestrian paths to widen and improve an existing street.

and conclusions of law in which it "accepted" the developer's "proposed street pattern . . . including half-width improvements."

Benchmark then filed a land use petition under RCW 36.70C. The superior court ruled that "[t]he City could not accept the petitioner's proposal to make half street improvements to North Parkway after that proposal had been withdrawn prior to adoption of written findings and conclusions by the City." The trial court remanded for the City to consider whether traffic impacts caused by the development "support a requirement of half street improvements to North Parkway Avenue."

On remand, both the City and Benchmark performed traffic studies. Neither traffic study predicted any substantial increase in traffic along North Parkway in the area of the disputed half-street improvements. And neither study concluded that the development would cause North Parkway to become more "unsafe," although the City's study noted that "Parkway Avenue does not meet current safety and efficiency standards for width and lane configuration required by the Battle Ground Transportation Plan." This study recommended the improvements; Benchmark's study did not. Benchmark's expert also found that the development would not impact safety on North Parkway. The city council adopted findings and conclusions which again required the half-street improvements.[2]

Benchmark appealed to the superior court, which held that the City had failed to produce substantial evidence of an "essential nexus" or of "rough proportionality" be-

---

[2]The written conclusion reached by the city council was:

Taking into consideration all of the impacts on North Parkway, the respective conclusions of the two traffic engineers and the facts submitted to the Planning Commission and reflected in the record and in the Findings of Fact of the Planning Commission, and further noted by the members of the City Council, it is reasonable and proportional to require the applicant to make standard half-street improvements to North Parkway Avenue only as it fronts Melrose Park Subdivision, consisting of pavement, curbs, gutter, bike lane, sidewalk, and stormwater drainage facility, together with associated striping and signage.

tween possible impacts of the subdivision and the need for half-street improvements.

## ANALYSIS
### A. "Contract" Claims

Initially, the City claims it reached an oral agreement with Benchmark to make the half-street improvements in exchange for the City's approval of Benchmark's preliminary plat. The City acknowledges that no written findings, conclusions, or approval were made until after Benchmark told the City that it would no longer make the improvements. The City also states that it could have modified the "judicial decision" to approve the preliminary plat at any time before entry of "a document reflecting that decision."

The City cites a Pennsylvania case, *Board of Supervisors v. West Chestnut Realty Corp.*, 110 Pa. Commw. 481, 532 A.2d 942 (1987), for the proposition that "[a] developer may lawfully be required to comply with the provisions of its approved development proposal." In *West Chestnut*, a town ordinance specifically permitted the town to deny final approval if there were "variations" between the tentative development plan and the application for final approval. *West Chestnut Realty*, 532 A.2d at 946. Here, Battle Ground has no comparable ordinance. Thus, *West Chestnut* is of no help to the City.

 Benchmark responds that because Washington statutes and the city code require planning commission and city council decisions to be in writing, it never had preliminary approval until January 4, 1996, when the written findings and conclusions were entered. RCW 58.17.100; BGCC 16.103A.09; RCW 58.17.110; BGCC 16.103A.10; RCW 58.17.195.

We agree with Benchmark. The statutes cited require entry of written findings and conclusions. We hold that "preliminary approval" never existed until such written findings and conclusions were entered. If, as the City as-

serts, it could have modified its findings at any time before entry, then it could hardly be said that Benchmark had even a preliminary approval. And the City cannot claim a contract when it admits that it was not required to perform in return. *Lande v. South Kitsap Sch. Dist. No. 402*, 2 Wn. App. 468, 477, 469 P.2d 982 (1970) (citing *Larkins v. St. Paul & Tacoma Lumber Co.*, 35 Wn.2d 711, 214 P.2d 700 (1950)) ("It is elementary contract law that unless both parties are bound by mutual promises or considerations, neither is bound.").

Further support is found in the well-settled rule that a judge's oral decision is no more than a verbal expression of his informal opinion at that time. It is necessarily subject to further study and consideration, and may be altered, modified, or completely abandoned. "It has no final or binding effect, unless formally incorporated into the findings, conclusions, and judgment." *In re Marriage of Harshman*, 18 Wn. App. 116, 120, 567 P.2d 667 (1977) (citing *Ferree v. Doric Co.*, 62 Wn.2d 561, 566-67, 383 P.2d 900 (1963)). It is unquestioned that the city council was acting in a quasi-judicial role when it ruled on approval of the plat. *Snider v. Board of County Comm'rs*, 85 Wn. App. 371, 375, 932 P.2d 704 (1997) (citing *Miller v. City of Port Angeles*, 38 Wn. App. 904, 908, 691 P.2d 229 (1984) ("A decision to grant, deny or impose conditions upon a proposed plat is administrative or quasi judicial in nature.")).[3]

### B. Constitutional Issue—Fifth Amendment and Taking of Private Property

██ Where government issues a land use permit on condition that the applicant dedicate land to public use, the

---

[3]In *State ex rel. Gunning v. Odell*, 58 Wn.2d 275, 362 P.2d 254 (1961) the Washington Supreme Court held that until there was a written and signed resolution adopting a zoning change no decision had been made regarding the rezone. The oral decision of the board of county commissioners to approve the recommendation of the planning commission was found to be insufficient to review precisely because the board was at liberty to refuse to sign and enter the resolution requested by it. Until that written resolution was signed, there was no decision by the board. *Odell*, 58 Wn.2d at 277.

government must show an "essential nexus" between a "legitimate state interest," and the condition imposed. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987). Further, to satisfy the Fifth Amendment, the government must establish that its proposed condition is roughly proportional to the impact the proposed development will have on the public problem. *Dolan v. City of Tigard*, 512 U.S. 374, 391, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994). And this requires "some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391. We have identified four factors in these concepts: (1) a public problem; (2) a development that impacts the public problem; (3) governmental approval of the development based on a condition that tends to solve the problem; and (4) rough proportionality between the proposed solution and the development's impact on the problem. *Burton v. Clark County*, 91 Wn. App. 505, 520-23, 958 P.2d 343 (1998). At issue here are whether the development impacts a public problem and, if so, whether the proposed solution, the half-street improvement, is roughly proportional to the impact.

City Ordinances

■ The City argues that it was not required to do a *Dolan* site-specific study because it "has ordinances which require developers to provide half-street improvements to arterial and access streets which front their development as a standard regulation of new subdivisions." The City contends that *Trimen Dev. Co. v. King County*, 124 Wn.2d 261, 877 P.2d 187 (1994), supports its "legislative method" of mitigating the impact of a proposed development.

In *Trimen*, a developer was required to pay park development fees as a condition of approval of the development. The fees were exacted pursuant to a King County ordinance that required dedication of recreational land or payment of a fee in lieu of dedication as a condition of approval of the proposed development. KING COUNTY CODE 19.38.020. If the

developer dedicated land, the amount of land was calculated by a formula based upon the gross land in the proposed development and the zone of the development. If the developer chose to pay the fee in lieu of dedicating land, the fee was based upon the value of land that would have been dedicated. *Trimen*, 124 Wn.2d at 265. The court concluded that King County's ordinance met the *Dolan* proportionality test. The county had conducted a study to assess the county's park needs based upon projected population increases. The fee was based upon the value of the land needed to serve the additional park needs created by the development. *Id.* at 274. Because of this, the court held the county's "assessment of fees in lieu of dedication are specific to the site . . . ." *Id.* at 275. In short, King County's solution to the public problem was roughly proportional to the development's impact on the problem because both were keyed to the population increase caused by the development.

But Battle Ground's ordinance does not supply the same necessary correlation. The ordinance imposes an obligation to make half-street improvements based upon the length of development adjoining the street. And this does not necessarily relate to the additional use the development will impose on the street. Here, although the development bordered the street for approximately 600 feet, both traffic studies concluded that the traffic increase on North Parkway where the City required the improvements would be minimal.[4] In other words, there is no necessary correlation between the extent a development borders a street

---

[4]The Benchmark study showed that only six percent of the trips generated from the Melrose Park subdivision would turn north on Parkway. Additionally, the Benchmark study found that "[t]he resulting increase in traffic volumes on the northern section of [Parkway] is expected to be approximately 32 vehicles per day and 3 vehicles during the PM peak hour. This represents an increase in traffic volumes of approximately 1.4 percent on [Parkway]."

The City's traffic study did not make specific findings with regard to the percentage increase of trips on Parkway north of Onsdorff that would be generated by the subdivision. However, from the projected traffic pattern analysis in the City's study the figure can be generated. The City's traffic study indicated that the total number of site traffic trips added to Parkway north of Onsdorff during peak hours would be 10 trips. Existing plus site traffic peak hour trips using

and the extent to which residents of the development will actually use the street. We conclude that the City's ordinance does not meet *Dolan*'s requirement of rough proportionality based upon a site-specific study.

The City next contends that *Nollan* and *Dolan* do not apply because the City did not require a dedication of land, only payment of a fee. For support, the City cites footnotes from *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 16 n.7, 829 P.2d 765 (1992), and *Guimont v. Clarke*, 121 Wn.2d 586, 608 n.9, 854 P.2d 1 (1993). But the footnote in *Sintra* was passing and not necessary to the holding. The *Guimont* footnote relied on *Yee v. City of Escondido*, 503 U.S. 519, 529-30, 112 S. Ct. 1522, 118 L. Ed. 2d 153 (1992). Both *Guimont* and *Yee* dealt with allegations that business regulations constituted a physical taking of property. Both cases rejected that proposition. Neither case dealt with whether a land use case, requiring the developer to pay or incur costs as a condition of approval, is subject to a Fifth Amendment "takings analysis."[5]

The City also cites *Snider*, in which Division Three held constitutional a condition that the developer obtain rights-of-way from neighbors so that he could improve an access road. *Snider* concluded that *Dolan* did not apply because the government had not taken any of the developer's land. *Snider*, 85 Wn. App. at 380. We decline to follow *Snider* because we find more persuasive the reasoning of the Cali-

---

Parkway north of Onsdorff numbered 350. Therefore, even using the City's raw data, the increase in site trips on Parkway during peak hours (the only hours analyzed in the City's study) was a mere three percent. The same numbers are generated by comparing the raw data in the City's traffic survey for existing peak hour trips (numbering 340) and existing plus site traffic peak hour trips (numbering 350).

[5]The United States Supreme Court has applied the takings clause to other nonpossessory exactions unrelated to land development. *See, e.g., Eastern Enters. v. Apfel*, 524 U.S. 498, 530, 118 S. Ct. 2131, 2149, 141 L. Ed. 2d 451 (1998) (takings claim arises from a public program imposing a financial burden on a former employer). Most recently, the Supreme Court considered whether interest income generated by funds held in Interest on Lawyers Trust Account (IOLTA) accounts is private property of the owner of the principal. In deciding that it was and remanding the case to the District court for a takings analysis, the Supreme Court recognized that even state use of interest income might trigger a takings analysis. *Phillips v. Washington Legal Found.*, 524 U.S. 156, 118 S. Ct. 1925, 141 L. Ed. 2d 174 (1998).

fornia Supreme Court in *Ehrlich v. City of Culver City*, 12 Cal.4th 854, 911 P.2d 429, 50 Cal. Rptr. 242 (1996).

In *Ehrlich*, the city exacted a $280,000 recreational fee as a condition of developing a downtown property. The California Court of Appeals initially held the exaction constitutional, but the decision was handed down before *Dolan*. The United States Supreme Court accepted certiorari and vacated the decision with directions to reconsider in light of *Dolan*. *Ehrlich v. City of Culver City*, 512 U.S. 1231, 114 S. Ct. 2731, 129 L. Ed. 2d 854 (1994). On remand, the California State Supreme Court applied a *Nollan/Dolan* analysis, and the United States Supreme Court denied certiorari.

The *Ehrlich* court explained:

> The essential nexus test is, in short, a "means-ends" equation, intended to limit the government's bargaining mobility in imposing permit conditions on individual property owners—whether they consist of possessory dedications or the exaction of cash payments—that, because they appear to lack any evident connection to the public impact of the proposed land use, may conceal an illegitimate demand—may, in other words, amount to " 'out-and-out . . . extortion.' " (*Nollan*, [483 U.S. at 837]).
>
> Under this view of the constitutional role of the consolidated "essential nexus" and "rough proportionality" tests, it matters little whether the local land use permit authority demands the actual conveyance of property or the payment of a monetary exaction.

*Ehrlich*, 911 P.2d at 444.

■ Following the reasoning of *Ehrlich*, we hold that *Nollan* and *Dolan* apply here where the City requires the developer as a condition of approval to incur substantial costs improving an adjoining street.

Finally, the City argues that its decision as to the impact of the development on North Parkway was supported by substantial evidence—the City's traffic study—and the trial court erred by substituting its opinion as to the weight and

value of the evidence. The City points to its expert's conclusion that 80 percent of the estimated 534 vehicle trips per day generated by the development will use North Parkway. But this additional use is projected for that part of North Parkway running *south* of Onsdorf Street. And the half-street improvements required are for that part of North Parkway lying *north* of Onsdorf Street. The City concedes that the number of trips generated by the development on that part of North Parkway "may be relatively small." Nevertheless, the City contends that it is sufficient to show that a substantial amount of traffic will use "some part of that access street [North Parkway]." We disagree.

The City's argument fails the "essential nexus" test. *Nollan* and *Dolan* require that government's condition or proposed solution tend to alleviate the public problem. *Burton*, 91 Wn. App. at 522. Here the solution does not. If the development will cause additional traffic with its attendant problems on North Parkway south of Onsdorf, then the solution must address those problems. The planning commission had no evidence that improving North Parkway on the north side of Onsdorf would alleviate traffic problems on North Parkway south of Onsdorf. We conclude that the court did not err in finding that the City failed to establish an "essential nexus."

## ATTORNEY'S FEES

Benchmark claims attorney's fees under three statutes, RCW 64.40.020(2), 42 U.S.C. § 1988 (1976) (for the 1983 claim), and RCW 4.84.370.

■ RCW 64.40.020 states, in pertinent part:

(1) Owners of a property interest who have filed an application for a permit have an action for damages to obtain relief from acts of an agency which are arbitrary, capricious, unlawful, or exceed lawful authority, or relief from a failure to act within time limits established by law: PROVIDED, That the action is unlawful or in excess of lawful authority only if the final decision of the agency was made with knowledge of its unlawful-

ness or that it was in excess of lawful authority, or it should reasonably have been known to have been unlawful or in excess of lawful authority.

(2) The prevailing party in an action brought pursuant to this chapter may be entitled to reasonable costs and attorney's fees.

Because the damage claims have not been resolved yet, Benchmark's claim for attorney's fees under this statute is premature. *Cobb v. Snohomish County,* 64 Wn. App. 451, 460, 829 P.2d 169 (1991).

■ 42 U.S.C § 1988 provides, in pertinent part: "In any action or proceeding to enforce a provision of [42 U.S.C. §§ 1981-1983] . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs[.]"

This issue must also be considered first in the trial court. Although Benchmark may be considered the prevailing party, at least in part, an award of fees under 42 U.S.C. § 1988 is discretionary. Such discretion is best exercised at the conclusion of all matters in the trial court.

■ Finally, Benchmark asks for fees under RCW 4.84.370.[6] Under this statute, a party in a land use action who "prevails or substantially prevails" at the administra-

---

[6]RCW 4.84.370 provides, in pertinent part:

**Appeal of land use decisions—Fees and costs.** (1) Notwithstanding any other provisions of this chapter, reasonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals or the supreme court of a decision by a county, city, or town to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit, site plan, or similar land use approval or decision. The court shall award and determine the amount of reasonable attorneys' fees and costs under this section if:

(a) The prevailing party on appeal was the prevailing or substantially prevailing party before the county, city, or town, or in a decision involving a substantial development permit under chapter 90.58 RCW, the prevailing party on appeal was the prevailing party or the substantially prevailing party before the shoreline(s) hearings board; and

(b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings.

tive level as well as at both the superior and appellate court levels is entitled to fees on appeal. Benchmark prevailed at both the superior court and appellate court levels. The only question is whether Benchmark "substantially prevailed" before the administrative level.

Benchmark contends that it was the prevailing party before the City because "the City approved its preliminary plat, even though Benchmark objected to the condition requiring dedication for and improvement to North Parkway Avenue."

"The determination as to who substantially prevails turns on the substance of the relief which is accorded the parties." *Marine Enters., Inc. v. Security Pac. Trading Corp.*, 50 Wn. App. 768, 772, 750 P.2d 1290 (1988) (citation omitted). "Various cases say the prevailing party is the one 'who receives an affirmative judgment in its favor.' " *Kysar v. Lambert*, 76 Wn. App. 470, 493, 887 P.2d 431 (1995) (quoting *Marassi v. Lau*, 71 Wn. App. 912, 915, 859 P.2d 605 (1993)). The prevailing party need not prevail on his or her entire claim, *Silverdale Hotel Assocs. v. Lomas & Nettleton Co.*, 36 Wn. App. 762, 774, 677 P.2d 773 (1984), but he or she must substantially prevail. *Marassi*, 71 Wn. App. at 916. If both parties prevail on major issues, there may be no prevailing party. *American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 234-35, 797 P.2d 477 (1990); *Marassi*, 71 Wn. App. at 916.

 Here, although Benchmark received plat approval before the city council, the approval came with a major condition—paying for half-street improvements. And Benchmark did not improve its position from the planning commission level to the city council level. Under these circumstances, we decline to hold that Benchmark was the prevailing party before the city council. Accordingly, Benchmark is not entitled to fees under RCW 4.84.370.

In conclusion, we hold that Benchmark was not bound by the City's oral decision to require half-street improvements, that *Nollan* and *Dolan* apply to the imposition of

costs to improve an adjoining street, and that neither the City's ordinance nor the evidence before the planning commission satisfied the *Nolan* and *Dolan* requirements of showing an impact and a solution roughly proportional to the impact.

Affirmed.

BRIDGEWATER, C.J., and MORGAN, J., concur.

Review granted and case remanded to the Court of Appeals at 138 Wn.2d 1008 (1999).